## ROBERT DAVIS v. STATE.

No. A-1183.   Opinion Filed May 14, 1912.

(123 Pac. 560.)

1.  **LARCENY—Evidence—Sufficiency.**  In a prosecution for larceny of live stock, the evidence is held to support the verdict, and that no reversible error was committed on the trial.

2.  **LARCENY—Evidence—Possession of Stolen Property.**  In a prosecution for larceny of live stock, the fact of the theft having been proven, the question was whether the defendant stole the cattle, or bought them without notice that they had been stolen.

    **Held,** the presumption from possession of property, recently stolen, is one of fact, to be drawn or not, as the jury may determine, in connection with and in consideration of all the evidence in the case.

3.  **LARCENY—Evidence—Possession of Stolen Cattle.**  In a prosecution for larceny of certain cattle, where the evidence for the defense tended to explain the defendant's possession of the cattle by purchase from persons other than the owner, it is competent, in rebuttal, to show the defendant's contemporaneous possession of other stolen cattle.

4.  **APPEAL—Misconduct of Prosecuting Attorney—Harmless Error.**  A conviction will not be reversed for alleged misconduct of the prosecuting attorney, unless this court can say that the prosecuting attorney was not only guilty of misconduct, but that such misconduct might, in some degree, have influenced the verdict against the defendant.

(Syllabus by the Court.)

*Appeal from District Court, Muskogee County;*
*R. P. DeGraffenreid, Judge.*

Robert Davis was convicted of cattle stealing, and brings error.   Affirmed.

The plaintiff in error, Robert Davis, was convicted in the district court of Muskogee county on an information filed in said county January 25, 1911, wherein he was charged with the larceny of two cows, the property of B. V. Bushears.   Said larceny is alleged to have been committed June 16, 1910.   Trial was had at the February, 1911, term of said court.   The jury returned a

verdict of guilty, and assessed his punishment at two years' imprisonment in the penitentiary. On March 2, 1911, judgment and sentence was entered in accordance with the verdict. To reverse this judgment, an appeal was taken by filing in this court, on June 10, 1911, petition in error, with case-made.

The proof on the part of the prosecution, briefly stated, is as follows:

B. V. Bushears testified: That he lost two cows June 14, 1910, one blue Jersey, branded "W. W.," and marked underhalf crop in the left and split and underbit on the right; other, good-sized white and black spotted, and marked "E. V." on left side, and underhalf crop in the left and split and underbit on the right. Made search for cattle, and found they had been shipped to Kansas City from Checotah, Okla. The cattle were taken in Muskogee county, Okla., without my knowledge or consent.

J. W. Jimmison: Lives about half mile from Bushears, and had some cattle on the range with Bushears' cattle. Made search for some cattle in June, 1910. Tracked them over the mountain into a canon. This mountain is about three-fourths of a mile northeast of Briartown. "We tracked the cattle about three-fourths of a mile along a very dim road. There were two horses, one shod and other partly shod. I lost two Hereford heifers at that time. My brother and John West went to Checotah, and found that the cattle had been shipped from there." This was · about Tuesday, June 14, 1910. Heifers, branded "J. M." on left side.

J. V. Parmenter: On June 16, 1910, was in Checotah. Went to depot in Checotah that day to inspect bill of lading, and saw same and got copy of it, and telegraphed to the Kansas City people to have the cattle inspected and make a record of the brands. This telegram was sent to Godair-Crowley Commission Company, Kansas City, Mo.

Charles Hamilton, Kansas City, Mo.,: On June 18, 1910, inspected car of cattle in Kansas City, shipped from Checotah, Okla., by Bob Davis to Godair-Russell Commission Company, and kept record of marks and brands of whole shipment. Witness ·

testified to marks and brands of all the cattle, including one cow, branded "B. V." on left side, split and underbit in the right and undercrop the left, and one cow, branded "W. W.," separated left side and marked as above.

Ed Toner: Lives at Carlsbad, N. M. Was in Kansas City June 18, 1910, and helped Hamilton inspect car load of cattle. Testimony same as Hamilton's.

E. J. Collier: Agent Missouri, Kansas & Texas Railway Company, at Checotah. Bob Davis shipped car load of cattle from Checotah, June 16, 1910, to Godair-Crowley Commission Company, Kansas City, Mo. There was 34 head. Bob Davis signed the contract. There were a number of cars of cattle shipped from Checotah along about that time. Had conversation with man that said he was Davis about getting this car. He is the man that signed the contract; but I have since learned it was Pony Starr. I am positive that Davis never made the deal for the car.

D. E. Nester, Checotah: Agent Missouri, Kansas & Texas Railway Company, and custodian of bills of lading: Have bill of lading, dated June 16, 1910, for a car of cattle, shipped by Bob Davis. This contract is introduced in evidence.

Robert Jones, Checotah, butcher: Saw Bob Davis on June 16, 1910, about 1½ miles each of Checotah, on the road with Pony Starr and some other men that witness did not know, driving cattle. Counted 34 head. Asked Bob Davis the price on them, and he said they had come so high he would have to ship them to get out on them. He said he had attempted to get cars at Porum, but couldn't. These were fat cattle, and they were driving slow. Noticed one calf in the bunch.

C. E. Jones: Saw Bob Davis and three or four other men at the edge of the town of Checotah on June 16, 1910, driving 30 or 35 head of cattle. Did not know who the other men were.

Peter Graham: Was living on Bob Davis' place, in Muskogee county, in June, 1910. Helped drive some cattle to Checotah about middle of that month. "Bob Davis, Pony Starr, Cliff Sellers, and Leonard McCulloch were with me. We were driving something over 30 head. They were shipped at Checotah, but I don't

know who to. These cattle were driven from Davis' pasture. I presented a check for $1,000 to the Bank of Commerce about June 20, 1910. Bob Davis gave me the check, and said it was for a draft on some cattle he had shipped from Checotah and some money he had in bank. When Bob gave me the check, he said he didn't want to go to Porum; that they had a writ for him there."

M. R. Chilkert, banker: June 22, 1910, received from Kansas City, Mo., eight hundred and nineteen dollars and some cents for Bob Davis, and placed it to his credit. "Pete Graham presented a check for $1,000 that day, and I didn't pay it; and late in the day another check for one thousand and ninety dollars and some cents (Bob Davis' balance) was presented by Sam Davis, Bob's brother, and I paid it."

Pete Graham, recalled: Saw Bob Davis and Cliff Sellers driving some cattle on the evening of June 13, 1910, coming from toward Porum. They had seven or eight head. "I noticed one black and white spotted cow that looked to be the same one that was shipped. She was heavy with calf, and had a calf before she was shipped. When I came to Bob Davis' about two years ago, all the cattle he had was some milk cows. I heard he had been in the cattle business before that."

B. V. Bushears, recalled: The black and white spotted cow that was stolen from witness was heavy with calf when missed.

## The Defendant's Evidence.

J. N. McMurray, farmer: Lives two miles north of Porum. Was at Bob Davis' place about middle of June, 1910, hunting some horses for Chilkert and Pony Starr, and along about 5 o'clock in evening saw a trade for some cattle. Cliff Sellers and Dan Foster drove 17 or 18 head in there and left them in the corral and came up to house and got some water, and Bob asked where they were going with the cattle, and they asked for pasture until they could ship them; and Bob said if they would make the price right he would save them the trouble of shipping them. They asked him $350 for the cattle. He bought them; but witness did not know how much he paid for them. On cross-examination, it

was shown that witness was intimately acquainted with Bob Davis and Pony Starr for many years, and was in attendance on court without a subpoena. Cliff Sellers worked for Pony Starr.

Leonard McCulloch: Was living at McMurray's in June, 1910. Saw cattle trade between Bob Davis and Cliff Sellers and Dan Foster, between 2 and 3 o'clock in afternoon. Did not examine cattle. Looked to be between 15 and 20 head in the bunch. "I saw Bob pay Sellers the money for the cattle. I was over there gathering some horses for Mr. Chilkert. Have known Bob Davis and Pony Starr about three years. Don't know what day of the week this trade was made, but about the middle of the month. Saw Bob pay in greenbacks out at the wood pile; the money was handed to Foster. I don't know where Foster is now. Cliff Sellers was just in and out of there; he was not working for Pony Starr. I helped drive the cattle to Checotah. Bob Davis paid me. Pony Starr subpoenaed me to be here. I haven't talked with a soul about this case."

Clem Vann, Porum: Saw Dan Foster and Cliff Sellers driving some cattle, near Briartown, along about middle of June, 1910. They were going north toward the mountain. "Amond Davis was with me. I was down there hunting cattle. I thought they were driving 10 or 12 head. Amond Davis is a relative of Bob's. I heard a few days after that these cattle were stolen, but never told anybody about what I had seen, because I didn't think it was any of my business. I think Cliff Sellers was staying at Pony Starr's at that time. I don't know where Bushears or Mouser lives. This was about half a mile east of Briartown. I never paid any attention to the brands on the cattle; they were all kinder dark colored."

Amond Davis: Was living at Vann's in June, 1910. Second cousin of Bob Davis. Testimony practically as Clem Vann's except that witness wouldn't be positive as to identity of parties he saw driving the cattle.

J. M. Blevins: Testified that he lived at Texanna, and about the 3d of July, 1910, heard Dan Foster say that they had accused the wrong man of stealing those cattle; that he and Cliff

Sellers had bought the cattle and sold them to Davis. "I don't know where Dan Foster is now, or where Cliff Sellers is. They both claimed they came by the cattle honestly. Bob and Ed and Charles McClure was with me when this conversation occurred."

Charles McClure: Testimony practically same as Blevins. Witness said Davis had been arrested for stealing these cattle when he had this talk with Foster, but that he never told anybody about what Foster had said.

Bob McClure: Same as Charles McClure.

Chester Pitts: Lives close to Porum. Soon after Bob Davis and Pony Starr were arrested for stealing these cattle, Cliff Sellers made a statement, in the presence of witness and Mr. Blake, about them. "I had started out home with Blake, and we met Cliff about a mile from Porum, west, and we spoke, and he said, 'I hear they got Bob Davis and Pony Starr arrested,' and I said, 'Yes.' And he said: 'I sold them cattle to Bob and got the money for them, and I am going in and give up. I don't want anybody else punished for what I done.' But he said: 'I got them cattle honestly, and I think I am plenty able to prove where I got them.' I worked for Bob Davis, and have known him for 15 years. I don't remember that I ever told anybody around Briartown about my conversation with Cliff Sellers."

Bob Davis, the defendant, testified on his own behalf: Bought these cattle from Cliff Sellers and Dan Foster. "Jim McMurray was at my place when I bought them, and I told him to tell Pony Starr to order cars for me at Warner to ship these cattle. Pony told me he tried to get the cars at Warner, but did not know for certain whether they could get them on such short notice. Pony Starr went to Checotah with me. He was going back down that way. Pony had no interest in these cattle. I signed the bill of lading myself. Pony had nothing to do with shipping the cattle. I didn't pay any particular attention to the brands on the cattle. They were fat cattle, and the market was good. I notice one branded 'J. M.' and one 'A. L.' I bought seventeen head and paid $305 for them. Peter Graham is unfriendly to me, and he and his brother have been packing guns for me. I think I notice a

large black and white spotted cow in the bunch. I think the W. W. brand was in there. I think I penned these cattle on the 14th of June, about 5 in the evening. I don't remember whether there was a blue Jersey cow or not. I have known Pony Starr about 15 years. I had known Cliff Sellers about two years. Sellers and Pony were gathering cattle for Chilkert, and they both helped me drive these cattle to Checotah."

The defendant, recalled, testified: That he had bought another bunch from Cliff Sellers and Dan Foster on the same day; that they delivered the second bunch the Monday following; that no person was present at that time. The trade was made in his pasture; that he bought 20 head, and paid $375 for them. Paid for them in greenbacks, 20's, 10's, and 5's. Got the money by selling some hogs in the fall and some in the spring, and did not deposit it. Kept his money, about $800, with him. Had known Cliff Sellers about two years while he worked for Pony Starr. Had never heard of his owning any cattle before this time. They did not own any land there. That he shipped the second bunch of cattle from Warner. That the second bunch was branded "J. C.," and was afterwards claimed by a fellow named Caesar and a fellow named Cohorn.

J. G. Blake: Was with Chester Pitts, and had conversation with Cliff Sellers about cattle. Sellers said: "I hear they have Davis arrested, and they have got the wrong man; I drove them cattle to Davis and received pay for them." That was about all he said. Don't remember just when this conversation was. It was in the summer on Saturday; but don't know the month.

S. S. (Pony) Starr: Heard of Davis being arrested for stealing cattle. "Short time before that, I tried to get cars for him at Warner. I helped Bob drive the cattle to Checotah. I had no interest in the cattle. Cliff Sellers came home with me from Checotah. He had worked for me, but was not staying at my house at that time. I don't know where he was staying. I never knew of him owning any cattle. I knew of him owning one horse. I was not down around Briartown. Bushears' brand is 'E. V.' I don't know whether there were any E. V. cattle in that bunch that was shipped. It was a mixed bunch. I have

known Dan Foster about six years. He was from Leavenworth, Kan. I have bought some cattle from him a good while ago. I don't know what he was doing at that time. The last time I saw him was at Porum, about the time this cattle business came up. He was in Williams' store, buying some clothes. It was after Bob Davis had been arrested. I don't remember a white and black spotted cow in that bunch."

### State's Rebuttal.

Henry Mouser, Briartown, farmer: "On the 14th of June, 1910, I was in the bottoms plowing coin, and saw two men driving cattle. I wouldn't be certain who they were; but I took one to be Pony Starr and the other Bob Davis. I have known them about three years. I would not swear positively who it was."

*S. M. Rutherford,* for plaintiff in error.

*Chas West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). Counsel for plaintiff in error contends that the court erred in not sustaining the motion for a new trial, because there was not sufficient evidence to sustain the verdict, and in the brief states: .

"We submit there is no evidence in the record which tends to connect the defendant with the crime of stealing, unless it be that of his possession of the cattle. This cannot be considered a circumstance even against him; for the manner in which he obtained possession of the cattle is fully explained by himself and his witnesses."

We have considered the record in its most favorable light to the defendant, and we cannot agree with this contention. Our opinion is that the evidence is sufficient to sustain the conviction; and, while the defendant offered evidence tending to show that he purchased the cattle from Cliff Sellers and Dan Foster, the jury found against him. It is undisputed that the stolen cows were in the defendant's possession immediately after they were stolen; and it is shown that the defendant disposed of them,

together with other stolen cattle, by driving them across the country, a distance of about 20 miles, to the town of Checotah, and there shipped them to Kansas City.

The record discloses that Sellers and Foster were not owners of cattle or other property, and the defendant knew of such fact; that Sellers was an employee of Pony Starr; and that Sellers, Foster, Pony Starr, and the defendant were at all times acting together in respect to these cattle, and when the defendant was arrested for the theft of the cattle Sellers and Foster disappeared from the country.

The possession of property, recently stolen, is evidence against the accused, which, like all other evidence, is to be taken and considered by the jury in connection with the other evidence in the case. Mr. Bishop says:

"When the fact of a theft has been shown, and the question is whether or not the defendant committed it, his possession of the stolen goods, either sole or joint with others, at a time not too long after the stealing, is a circumstance for the jury to consider and weigh in connection with the other evidence. Its significance will vary with its special facts, and with the other facts of the case, among which are the nearness or remoteness of the proven possession to the larceny, the nature of the thing as passing readily from hand to hand or not, what explanations he made on it being discovered that he had the goods, together with such other facts as ought reasonably to influence a juror's opinion." (2 Bish. New Cr. Pro. par 740.)

A question merely of fact is presented by the evidence, dependent wholly upon the credibility of the witnesses and the weight of their evidence. There could be no case suggested presenting a matter more proper for the decision of a jury. The jurors are the sole judges of the credibility of the witnesses who testify before them; and they are not bound to, nor can they be compelled to, credit the testimony of any witness, whether contradicted or not. When a jury returns a verdict of guilty in this character of a case, it indicates that the explanation of the defendant's possession, no matter how plausible, was not believed by the jury; and, unless, upon a fair consideration of all the facts and circumstances in evidence, it appears that the jury were not

governed by the evidence in their finding, the verdict will not be disturbed on the ground of insufficiency of the evidence.

Certain misconduct on the part of the prosecuting attorney during the trial is alleged. The prosecuting attorney, when the witness Nester testified, made a statement in the presence of the jury. The record, in respect to this alleged error, is as follows:

"Mr. Disney: Now, at this time, I desire to ask Mr. Rutherford if he will not agree to let this be considered in evidence and used in the other cases against this defendant. Mr. Rutherford: I desire to object to that statement. We are trying this case, and not any other case. I want the court to instruct the jury that any remark made by the county attorney in their presence to be disregarded; that is, the remark about the other cases. Judge De Graffenreid: Gentlemen of the jury, you are instructed not to consider the remark made by Mr. Disney with reference to the other cases against this defendant. Mr. Rutherford: I desire to save an exception to the statement and remark of Mr. Disney."

It appears that counsel for defendant at the time requested the court to instruct the jury to disregard any remark made by the prosecuting attorney in their presence; and the court very promptly, at the suggestion of counsel, so instructed the jury. Counsel at that time certainly thought that the error could be cured by the court's instruction; else why the request? If the court could cure the error at the time, and complied with counsel's request, why should counsel now complain? Especially is this true, we think, in view of the fact that all along throughout the record it is made to appear that other cattle were missed from the same range that these cows were taken from about the same time that these cows were alleged to have been stolen; and, at the time the defendant shipped these particular cattle to Kansas City, he shipped at least 32 head of other cattle that were branded and marked with the brands of well-known citizens of that community; and it was not attempted to be concealed by the defendant, or by anybody, in so far as this record discloses, that other larcenies of other cattle from other people occurred about the time these cows were stolen.

When the defendant's possession of property, recently stolen, is attempted to be accounted for, it is competent to show the de-

Opinion of the Court.

fendant's contemporaneous possession of other stolen property. For the reason stated, we think that whatever error, if any, was created by the remark of the prosecuting attorney was cured by the instructions of the court to the jury to disregard the same.

Lastly, it is contended that the trial court erred in forfeiting the defendant's bond in open court, because the defendant did not appear when court convened pursuant to adjournment during the trial. Counsel claims: "This could have been done quietly and without calling attention of the fact to the jury, if it had been necessary at all." If the defendant did not wish to have his bond forfeited, he should have appeared according to its conditions; and he cannot be heard to complain of the action of the court that was caused by his own laches. Counsel cites no authority in support of this contention; but states that the forfeiture was occasioned by a misunderstanding on the part of the defendant and his counsel as to the hour to which the court adjourned. As the record discloses that the proceedings continued regularly after the forfeiture was had, we presume the proper explanation was made, and the forfeiture set aside. The court did nothing more than its duty under the law. It must therefore be presumed that the action of the court was without bias, and was not prejudicial to the substantial rights of the defendant. The other assignments of error were abandoned in the argument of the case. The foregoing being all the assignments presented to the court, both in the brief and oral argument, we shall consider the others as waived.

We think the evidence well supports the verdict. The defendant had a fair trial, and his conviction was an act of justice.

Perceiving no prejudicial error in the record, the judgment of the district court of Muskogee county is affirmed.

FURMAN, P. J., concurs; ARMSTRONG, J., not participating.