## JOHN M. SHIELDS v. STATE.

No. A-4993.   Opinion Filed Sept. 14, 1925.
Rehearing Denied Nov. 28, 1925.
(240 Pac. 661.)

Freeling, Hood & Howard, for plaintiff in error.

George F. Short, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., for the State.

EDWARDS, J. From a conviction on a charge of larceny of an automobile, the plaintiff in error, hereinafter called defendant, has appealed.

The record discloses a state of facts about as follows: On March 30, 1922, one J. L. Duncan, a resident of Oklahoma City, parked his car, a Ford coupe, on Main street, near the Criterion Theater, left it and was away about 30

minutes and when he returned his car was gone. About 20 days later he found this car, much altered in appearance, parked on Main street. The tires had been changed. It had a new license tag, new bumpers, a new steering wheel. The fender braces had been removed and the numbers altered and probably other changes. He called officers of the police department, who watched the car, and soon Mr. R. H. Gardner and others came and got in to drive away, when they were accosted and informed that the car belonged to Duncan. Mr. Gardner, who was a business man of the city, immediately informed them that he had purchased the car from defendant. Thereupon Duncan, Gardner, and the police officers went to the office of the defendant and had a conversation with him. Several subsequent conversations were held between Duncan, the police officers, and the defendant, which will be referred to later. An information was filed, charging the defendant and H. V. Owen jointly with larceny of the automobile in question. A severance was taken and at the trial of the defendant H. V. Owen testified in behalf of the state. The defendant had been a resident of Oklahoma City for many years, was engaged principally in the real estate business, and was of considerable means and influence. His codefendant, H. V. Owen, had been a citizen of Oklahoma City for several years, was engaged principally in the secondhand automobile business, and had formerly been in the employ of the defendant as a real estate salesman.

It is the theory of the state that the defendant did not personally physically steal the car in question, but that he was implicated in the theft, received the car in question, had the alterations made by his codefendant, Owen, and was the real criminal. It is the theory of the defendant that he bought the car with others from his codefendant, Owen, and openly handled them, and had no connection with the theft or knowledge that they were stolen. The defendant assigns various errors, which may be summa-

rized as follows: First, insufficiency of the evidence; second, error of the court in refusing requested instructions with reference to possession of recently stolen property; third, error of the trial court in comments on the testimony in the presence of the jury; fourth, error in refusing requested instructions upon the law of accomplice. These assignments will be considered in the order presented.

Considering the first assignment; i. e., insufficiency of the evidence, the larceny of the car is established beyond question and its possession traced to the defendant a few days after it was stolen. Upon being questioned, the defendant made an explanation of his possession. When first questioned, he appeared nervous and offered to pay for the car. When asked from whom he got the car, he stated he did not know and said, in substance, that a nice dressed man came in, put up a hard luck story and sold him the car for $500 in cash; that he knew the man when he saw him, did not know his name or where he lived, and did not take a bill of sale. In the course of investigating the defendant's connection with this car, it was ascertained that during a short time he had handled five other stolen cars, all Ford coupes, except one, a Cadillac. As the possession of the different cars was traced to the defendant, he was questioned about them in various conversations, and stated that he bought them from the same person from whom he bought the Duncan car, had no bills of sale, and always paid cash.

The evidence would indicate that defendant sought to conceal his connection with the cars and made untruthful explanations of his possession. J. L. Duncan testified as follows:

"Q. Did you have any conversation with Mr. Shields then about this car? A. Yes.

"Q. Tell the jury the substance of your conversation you had? A. Well, Mr. Wolf, my wife and myself went

back over to his office—rather I met my wife in front of his office and we all went into his private office. I asked him from whom he had bought this car, and he said he didn't know, and he offered to pay me for it or return my car. I told him I would like to know who the thief was more than I wanted the car. He said he didn't know who he bought it from.

"Q. Did he tell you where the man lived, or that he knew where he lived? A. No; he didn't say. He said he did not know. He said he was a nice dressed man, walked in there and sold him the car. * * *

"Q. I will ask you if at any of these conversations he told you the name of the party from whom he bought it? A. No; he did not. Not until after—I don't know about the time—this information was filed against him he told. * * *"

Fred Smith, of the stolen car department of Oklahoma City, testified in reference to statements made by defendant:

"* * * Q. What did he say and what did you say, or any one say in your presence or his presence? A. He was taken up to the chief's office and the chief asked him where he bought the car.

"Q. What did he say? A. He bought it from a man that he didn't know what his name was; didn't know where he was; knew him when he seen him.

"Q. Knew him when he saw him? A. Yes.

"Q. Did he furnish you any other description of the man other than what you had told the jury? A. No. * * *

"Q. Was anything said with reference to whether or not he had a bill of sale for the car at that time? A. Well, we asked him if he had a bill of sale, and he said he didn't have.

"Q. You say that was the first conversation you had with him? A. That was the first conversation.

"Q. He said he didn't have? A. Said he didn't have a bill of sale.

"Q. Now then, did you see him again that day, after this first conversation? A. I don't know whether we saw him again that day or not. We saw him the next day.

"Q. What was the occasion of seeing him the next day? A. Went to see him about another car.

"Q. What kind of a car was it? A. Ford coupe.

"Q. Whose car was it, if you know? A. Why Mr. C. C. Cantrell had that car. * * *

"Q. When he came to the police station, what was said to him with reference to this Cantrell car, and what did he say? A. We asked him if he bought this car. * * * Said it was the same party that sold the other car, the Duncan car. Asked him if he had a bill of sale, and he said he didn't. * * *

"Q. What other conversation was had at the time he talked to you about this Cantrell car? A. Well, we asked him if he had bought any more.

"Q. What did he say when you asked him that? A. He said he had not—that was all. * * *

"Q. State whether or not at the time you talked to him about the Duncan car, the Cantrell car, and the Hale-Fox car there was anything said on the part of this defendant as to manner he paid for these cars. A. Yes; we asked him.

"Q. What did he say? A. What he paid on each of these coupes—he told us he paid $300.

"Q. And did he say how he paid it? A. In cash. * * *

"Q. Have you had any further conversations with him later about any other cars? A. We did.

"Q. When was that with reference to this date? Was it the next day or several days after? A. Why, we got a car that Miles F. Smith was supposed to have, after that.

"Q. Did you talk with Mr. Shields about it? A. We identified that car and called Mr. Shields and asked him about it.

"Q. What did he say with reference to that car? A.

He said he bought—that was one of the cars he bought, and that time we asked him if he had any deals with any more of them, and he said at that time that was all he had anything to do with. * * *

"Q. Now, with reference to a bill of sale, was there anything said different from what you have already told the jury regarding a bill of sale at a later date? A. There was after he first talked with Mr. Wright.

"Q. What was said with reference to a bill of sale? A. After he talked with Mr. Wright, he told us he had a bill of sale to all of the cars. * * *"

Harry Wolf, a police officer of the stolen car department of Oklahoma City, testified:

"* * * Q. Just tell the jury everything that you can recall of the conversation in the presence of Mr. Shields— I mean that day? A. Well, I tried to find out where Mr. Shields had got the car.

"Q. What did Mr. Shields say to you in that respect? A. He said he had bought it from a man whom he knew real well, but he didn't know his name and didn't know where he lived, but he seen him most every day or two on the street, and wouldn't be any trouble to get hold of him. * * *

"Q. Just tell the jury the substance of the conversation you had with him? A. Well, the conversations didn't vary a great deal. They were about along the same line each time.

"Q. Just relate the substance as nearly as you can. A. We tried every way we could to find out where Mr. Shields had got these cars and who he had bought them from and how much he paid. He first stated he didn't have any bill of sale for any of the cars and later produced a bill of sale for each and every one of them. * * *

"Q. Now, did you have any conversation with him concerning the second of these six cars you testified about? A. The conversations were all about the same. He said that he had bought the cars from this fellow who brought them to the office or somewhere over there, and he looked

the cars over and sent them up to Owen's place for inspection and to have the wheels changed and a bill of sale made out and one thing and another. * * *

"Q. What did he tell you in that respect, if anything? A. He said he bought this Cadillac from the same party he got the other cars from, and he paid $800 cash out of his pocket.

"Q. What if anything, did he say as to where he lived? A. Didn't say where he lived. * * *

"Q. What did he say in that respect? A. He said he got all of the cars from the same party.

"Q. Did you ask him the name of this man? A. Yes.

"Q. What did he say? A. Said he didn't know. * * *

"Q. Did you learn about all of these six cars at the same time or different dates? A. No, sir; we learned of—after we got the Duncan car, we learned of Mr. Cantrell's car. After we got Mr. Cantrell's car and identified it, then Chief Binion at that time called Mr. Shields over and talked to him about it and asked him if he had any more cars. He said he absolutely did not have any other cars; had not bought any more. * * *

"Q. What did he say to you about the bill of sale? A. Well, he said he didn't have a bill of sale for about the first week, I think.

"Q. Then at any later time did he make any statement concerning the bill of sale? A. Yes; later on he showed me a bill of sale to one car, and then later on he had a bill of sale for all of them. I think he told me at that time some one had got in his desk and stole them. This was a week or 10 days after we first asked him. * * *"

H. V. Owen, jointly charged with the defendant, a witness for the state, testified as follows:

"* * * Q. Are you the H. V. Owen that is charged jointly in this case with Mr. Shields? A. Yes. * * *

"Q. State whether or not you ever worked out of his office? A. I did.

"Q. About how long was that? A. I was—I believe in the summer or fall of 1918 or somewhere. It was along in 1918—no; I never worked with him in 1918. It was 1919 or 1920. * * *

"Q. Did you have any occasion, or any kind of transaction with Mr. Shields on the 6th day of April, this year? A. I did.

"Q. I wish you would tell the jury in detail all the facts concerning that transaction? A. Well, it was along in the morning or forenoon or was in the morning—in the forenoon perhaps—oh, it was after 9 o'clock, between 9 and 10, Mr. Shields called me up and told me the party or man was in town, and he would be up to my place, and to fix him out a bill of sale and deliver the car.

"Q. Just tell all the details of it you can—the details of the conversation? A. I did that. The man came up, I guess—oh, within 30 or 40 minutes after Mr. Shields called, and, when he came in, he had a bill of sale already made out. Mr. Shields had told me to get a lock—steering wheel lock and wheel for the car. I did that.

"Q. When had Mr. Shields told you that? A. That was in the conversation over the telephone.

"Q. Tell the jury everything that he told you in that conversation over the telephone? A. Well, that was about all with the exception of the steering wheel and lock combination. And, when the man came, I went over to either Lyons or the Southern Motors Supply, I am not positive, and bought a Spencer steering wheel—lock wheel. Came back and put it on the car and—the lock wheel on the car, and delivered the lock and wheel, the car, the keys and everything to Mr. Shields.

"Q. Where did you deliver it to Mr. Shields? A. At his office.

"Q. Where did you drive the car? A. In the alley between the Liberty Theater and Mr. Shields' office.

"Q. Where did you deliver the key? A. In Mr. Shields' private office; that is, it is just west of his main office and fronts on Robinson street, and I delivered the—then. He has a private office back of his main office and he

has a side entrance out in the alley. I delivered the lock, the keys, and the bill of sale and the license receipt to Mr. Shields.

"Q. Where did you get that bill of sale? A. The bill of sale—the man had the bill of sale made out.

"Q. That is the man that took the car up to your place? A. Yes; the man that delivered the car to me.

"Q. Where did you get the license receipt that you delivered to Mr. Shields? A. He delivered the license receipt with the bill of sale.

"Q. That is the man that delivered the car up at your place? A. Yes. * * *

"Q. Now what was said by you or Mr. Shields when you delivered to him the bill of sale and the keys and the license receipt for this car? A. Well, I guess Mr. Shields was in the back office, and I had taken the bill of sale and license and keys in to him and left the car in the alley and just walked in and told—I believe he was sitting down at this desk, I am not positive, he has a window, counter across the south—south window, and he came up there, and was just standing on the corner of the desk like this desk would be the same way, and, if I remember, I would be east this way, and there is a little kind of a place between the door and the desk, and I just stood at the corner of the desk and Mr. Shields got up and had his hand out, and I handed him the keys and everything, and had the license receipt and the bill of sale folded up, and gave me $25 and $9.50—he gave me $34.50.

"Q. What was the $9.50 for? A. $9.50 was the wholesale price of the Spencer lock and wheel. * * *

"Q. What was he paying you this $25 for? A. Well, it was for making up the bill of sale on the car and delivering it to Mr. Shields.

"Q. A little louder? A. I say for making out the bill of sale on the car and for just—generally looking after the car, I suppose, or putting the wheel on there, a little extra labor on that as a voluntary payment. The $25 was a voluntary payment from Mr. Shields.

"Q. Did you have any other transaction with him? A. I did.

"Q. On that line? A. Yes.

"Q. How many had you had? A. Five.

"Q. Prior to this? A. Yes.

"Q. Was the five including this or five excluding this? A. There was six total. * * *

"Q. Mr. Owen, I believe you testified this morning that you had seen this man that brought this car to your place of business, that is, the Duncan car, on some former occasion? A. Yes. * * *

"Q. What was the occasion of your seeing this man? A. Mr. Shields brought him up there. * * *

"Q. Did you see him on any other occasion prior to this Duncan car? A. I did.

"Q. How many occasions? A. Prior to the Duncan car, I believe I seen the man five times—no, six times, I believe, prior to the Duncan transaction.

"Q. Was it an occasion that you had similar transactions? A. Yes.

"Q. What kind of a car was involved in that? A. Ford coupe. That was the third occasion.

"Q. Did you have any knowledge of that man coming up with this car before he did arrive with it? A. Yes.

"Q. Where did you get that information? A. From Mr. Shields.

"Q. How would you get the information? A. Well, at that time I had no telephone, and Mr. Shields would come up with—to the yard himself. * * *"

The defendant in his own behalf testified:

"Q. Now, then, the next transaction you had with Mr. Owen was on the 6th day of April, 1923? A. It was. * * * A. About 8:30 on the morning of April 6th Mr. Owen called me at my office and says, 'I have a real nice Ford to-day.' Says, 'Got all modern conveniences on it.' He says, 'Has

big wheel on it and various things,' and I asked him what he wanted for it. Well, he said he ought to have a pretty good price for that, with all this extra equipment on it. 'Well,' I says, 'I wouldn't give over $300 for a second-hand car,' and we talked over the 'phone and he says, 'Well, I will take $300 for it.' * * * A. Mr. Owen called me and said he had this car for sale, and I told him I would take it. He says, 'I wish you would get me money for it; I don't want any check.' I says, 'All right,' and when the bank opened I went to the bank and got $300 and came back to the office and says, 'Mr. Owen, I am going to the Franklin Garage to have my car fixed up. * * *'

"Q. Now, Mr. Shields, at the time you met Mr. Owen, on North Broadway, near 6th and Broadway, had he delivered to you this car that has been identified as the Duncan car? How did you pay him for that car? A. Paid him $300 in cash.

"Q. You carried the money up there? A. I did.

"Q. Did you receive a bill of sale? A. I did. * * *"

In reference to his conversation with Duncan, he testified:

"Q. He asked you where you got it? A. He may have.

"Q. Do you recall whether he did or didn't? A. I don't recall it just now.

"Q. I will ask you if he didn't ask you where you got the car and you told him you didn't know or that in substance? A. I told him I knew the man from whom I got the car. I knew I had gotten it from Vic Owen.

"Q. I will ask you if Mr. Duncan didn't ask you the name of the man or give him the name of the man or that in substance of the party from whom you got the car? A. I don't know.

"Q. And you told him that you did not know his name? A. I didn't know from whom I had gotten the car. I knew I bought it from Vic Owen, but I didn't know the man who made the bill of sale. * * *"

This, with other evidence on the part of the state,

shows the recent possession of stolen property by the defendant, and that defendant procured his codefendant, Owen, to have alterations made in the car in question. His explanation of his recent possession of the car when first questioned is in conflict with his subsequent explanation, and indicated a concealment of facts. This evidence is contradicted, in part, by the testimony of the defendant and by incidental evidence in corroboration and by proof of good character.

The presumption arising from the possession of recently stolen property is one of fact and not of law. It is a circumstance for the jury to consider and weigh along with all the other evidence in the case. If the possession is unexplained, or if it is unsatisfactorily explained, or the explanation, even though plausible, is not believed, the jury will accord it such weight as they deem right and proper. They are the sole judge as to its weight, and when such fact with the other facts and circumstances in evidence, when given due weight, satisfy the jury beyond a reasonable doubt of defendant's guilt, it is sufficient to sustain the verdict. Slater v. U. S., 1 Okla. Cr. 275, 98 P. 110; Davis v. State, 7 Okla. Cr. 322, 123 P. 560; Gunter v. State, 18 Okla. Cr. 476, 184 P. 797; Cheeves v. State, 18 Okla. Cr. 480, 196 P. 726; West v. State, 19 Okla. Cr. 355, 198 P. 99.

Here the jury heard and observed the witnesses. Their verdict conclusively shows that they believed the evidence for the state and disbelieved that of defendant. This question as to who should be believed was within their province. This court does not have the power to become triers of fact and weigh conflicting evidence. Where the evidence and the reasonable and logical deductions to be drawn from it reasonably support the verdict, this court will not set aside the verdict for insufficiency.

Defendant also assigns as error the refusal of the trial court to give instructions requested in reference to pos-

session of recently stolen property. The requests state correct principles of law, but it is not every correct statement of law upon a subject that should be embodied in an instruction. The court gave no charge on the weight or probative effect of evidence of possession of stolen property. This court has consistently held that possession raises a presumption of fact, and not a presumption of law, as was said in the case of Askew v. U. S., 2 Okla. Cr. 155, 101 P. 121:

"The culpatory inference to be drawn from the possession of property recently stolen is not a presumption of law, but is a deduction of fact to be drawn by the jury alone, unforestalled by any instructions from the court upon the weight of the evidence."

And in such opinion quoted, we find in the case of Lehman v. State, 18 Tex. App. 174, 51 Am. Rep. 298, it is said:

"As a general rule, if a person in whose exclusive possession goods recently stolen are found fails to give a reasonable account of his possession when it is incumbent upon him to do so, the inference of guilt arising from the possession and the recent theft is sufficient to sustain his conviction of the theft. Nevertheless, this inculpatory inference is not a presumption of law, but is a deduction of fact to be drawn by the jury alone, unforestalled by any instructions from the court upon the weight of the evidence. But when this inculpatory possession constitutes the only evidence criminative of the accused, the case is one of circumstantial evidence alone, and the legal principles which control that species of proof should be given in charge to the jury."

The court correctly and fully instructed on the law of circumstantial evidence, and that the jury were the sole and exclusive judges of the facts proven, the weight of the evidence, and the credibility of the witnesses, and it was not error to refuse a more specific instruction in reference to recent possession of stolen property.

It is next assigned as error that the trial court com-

mented on the testimony of defendant, Shields, while he was testifying on cross-examination. The record shows the following to have taken place:

"* * * Q. I will ask you if Mr. Duncan didn't ask you the name of the man, or that, in substance, of the party from whom you got the car? A. I don't know.

"Q. And you told him you did not know his name? A. I did not know from whom I had gotten the car. I know I had bought it from Vic Owen, but I didn't know the man who made the bill of sale.

"Q. Answer the question.

"Mr. Howard: (for defendant) I think he has answered it.

"The Court: Answer the question. No; I think he is avoiding it.

"Mr. Howard: Give us an exception to the remarks of the court. * * *"

The defendant had not answered the particular question. His counsel did not interpose objection in the usual way, but instead himself commented on the answer of the witness by stating, "I think he has answered it." The statement by the court, "No; I think he is avoiding it," was brought about by the statement of counsel, and is in a sense invited. This is not a new question, but has been many times before this court and the Supreme Court of this state, and it has been well said that remarks made by a trial judge in the course of a trial in the presence of the jury which may affect the character and credibility of the witness are an improper invasion upon the province of the jury. It is clearly the duty of a trial court to refrain from allowing his actions or words to indicate to the jury his opinion of the credibility of any witness, and, where the comments of the court are such as to indicate his opinion, they will be deemed prejudicial. Wilson v. Ter., 9 Okla. 331, 60 P. 112; Hicks v. United States, 2 Okla. Cr. 626, 103 P. 873; Reed v.

State, 5 Okla. Cr. 365, 114 P. 1114; Harrison v. State, 11 Okla. Cr. 14, 141 P. 236; Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, Ann Cas. 1916A, 689; Shepherd v. State, 17 Okla. Cr. 630, 192 P. 238; Chambers v. State, 28 Okla. Cr. 156, 229 P. 646.

The rule announced, however, does not forbid a trial judge making any statement in explanation of his ruling. We think the statement here made, along with the other parts of the record, cannot reasonably be construed to be a reflection on the defendant, nor a comment on his character or credibility. It was for the court to say by his ruling whether or not the witness had answered the question, and while that might have been done by a mere dissent from the statement of counsel, or a direction that the witness answer, the addition by the court of the words used is not reversible error, particularly as those words were directed not to the jury but to counsel. 16 Corpus Juris, 827; State v. Surry, 23 Wash. 655, 63 P. 557; People v. Mooney, 132 Cal. 13, 63 P. 1070; City of Guthrie v. Carey, 15 Okla. 276, 81 P. 431.

The last assignment is based on the refusal of the court to instruct on the law governing the evidence of an accomplice. The instructions requested by defendant correctly state the law. Section 2701, Comp. St. 1921.

There is no contention under the statute and the many holdings of this court that a conviction cannot be had upon the testimony of an accomplice, unless his testimony is corroborated by such other evidence as tends to connect the defendant with the commission of the crime charged, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof. So well is this settled, that it is not necessary to cite authorities. Here the defendant and the witness H. V. Owen were jointly charged with the crime for which the defendant was being tried. However, it is not the fact that a person is

jointly charged with another that makes him an accomplice. In order to make an accomplice, it is necessary that the evidence show participation in the crime charged. State v. Shlagel, 19 Iowa, 169; Sizemore v. Commonwealth (Ky.) 6 S. W. 123; People v. Kosta, 14 Cal. App. 696, 112 P. 907; State v. Spotted Hawk, 22 Mont. 33, 55 P. 1026.

In the trial of the case it was not the theory of either the state or the defendant that Owen was an accomplice of the defendant. There was no effort to show that any immunity was promised Owen and the presumption is that he testified voluntarily. Dumas v. State, 19 Okla. Cr. 413, 201 P. 820.

The state contends that the defendant procured the car to be stolen and had it taken to the place of business of the witness Owen, where alterations were made. It was not the theory of the state that Owen was connected with the larceny of the car. The defendant contended that he was innocent, knew nothing of the larceny of the car, and under such theory could have had no accomplice. The same reasoning applies to the witness Neff, who had some connection with the car in question. The testimony of both the defendant and Owen is that they were not accomplices. To have instructed upon the law of accomplice would have been contrary to the theory of both the state and the defendant and to the evidence of the witnesses. Under this state of the record it was not error for the trial judge to refuse the requested instructions on the law of accomplice.

We have considered the thorough briefs, both of the state and the defendant, and have read the record with care, and find no error requiring a reversal of this case.

The case is therefore affirmed.

BESSEY, P. J., and DOYLE, J., concur.