ED COLEMAN v. STATE.

No. A-7612. Opinion Filed Nov. 8, 1930.
(292 Pac. 1050.)

J. R. Huggins and C. L. Hill, for plaintiff in error.

J. Berry King, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as the defendant, was convicted of assault with intent to kill and his punishment fixed at confinement in the penitentiary for five years. Motion for a new trial was filed, considered, overruled, exceptions saved, and the case appealed to this court.

The testimony of the state tends to show that on the 27th day of August, 1928, the defendant was working for J. W. Patton, in his printing office in Konawa, Seminole county, Okla. J. W. Patton stated he had an altercation with the defendant on the 27th day of August, 1928—

"Ted Stanton and a man by the name of Bob Little were present; I had been to dinner and returned and was standing back of Ted Stanton in the office; Ted asked Coleman if he was going to stay; Coleman said, 'I got a dirty deal,' using vulgar language, 'but I will stay'; I said, 'This is a dirty remark after the way I have treated you,' and he said, 'I will beat hell out of you,' and he flirted at me and I just reached out and pinched his nose; defendant did not do anything; Stanton took me back away from him and we talked awhile; defendant stayed there just a few minutes and left; he was gone about fifteen minutes and came back again; I had a conversation

with him; I felt like he had mistreated me and I wanted to give him a chance to make it right; I asked him why he called me that name, throwing the vulgar language at me regarding the deal, and he says he did not know, and did not make any apologies, and I says, 'You are not so big, I think you are just a son of a bitch'; he did not say anything, just walked out, and was gone about 30 minutes.

"I had printed a lot of contracts and left them for him to sign for so much printing in the paper, and he just threw them down on the desk and says they are worthless to me; and I says, 'Here is the original contract you signed, and I did the work; I done that for you'; he replied, 'You are tight,' and I said, 'No, I am not tight, you get out of here and stay out of here,' and I put my hand on his shoulder and pushed him to the door; I did not use any force, he walked to the door easily, and when he did I walked away from him about three of four steps, back toward the back end of the office to see what the help was going to do; I turned my head back toward the door and he had his pistol up toward me and as I turned he shot me; the bullet is still in my body; I came near dying, was in the hospital 11 days; when the defendant fired the shot he was standing in the front door of the office; when the defendant started out I walked with him to the door and just stepped back; I had two desks and I just stepped between them and turned my head toward the door when he fired the shot. I had no gun; I had a knife in my pocket but I did not open it."

Jess Cowen, while testifying for the state in rebuttal, was asked this question and gave the following answer:

"Q. Did you see a knife on the floor where Mr. Patton was standing? A. Yes, sir."

Several other witnesses testify as to the facts leading up to the difficulty, or what occurred immediately thereafter. None of them seem to know what took place between the defendant and prosecuting witness about the time the shot was fired. The defendant admitted shoot-

ing the prosecuting witness; he stated he had an altercation with Patton in his office where he was working; the date was Sunday; the altercation was near the door—

"I imagine 10 or 15 feet from the door of the office; it was crowded with just a little runway between and across a stand table setting this equipment on, and about five or six feet from the front door; I never had any trouble with the prosecuting witness until the morning of this trouble. Ted Stanton came in and wanted to go to Seminole, and I said I got a deal over there for Barney McKillop and wanted to go to see some parties at Seminole, and the prosecuting witness said. 'What is the matter here, are you quitting here,' and I said, 'No I'm through,' and he says, 'what does this mean,' and I says 'this is a cheap prospect here'; then Patton says, 'don't allude to me,' and I says, 'Pat, I was not alluding to you, what are you getting all ruffled up about'; he up and cursed me and grabbed me by the nose and broke my glasses; Patton then reached in his pocket and took out his knife and says, 'I will cut your throat.' Ted Stanton put his arm around him and took him away, and Ted came back and told me he was drunk and not to take any offense at what he said; I then went over to change my linen, dressed my nose and tried to get another pair of glasses, and stayed about there and read and used my typewriter; I took the contract and everything and went over to Patton's office and said, 'Pat, if we can't get along let's quit and I will pay you'; Pat started to figure up what I owed him, and I said, 'I had come to pay you, there is no use going along here, we can't get along'; while he was going in he said something sarcastic to me about me being big 'but I can knock your head off,' and I told him there was no need of us having any fuss, there was nothing to fuss about; I told him I did not want to have any racket; he kept going on and he said he would beat my head off, and says, 'I am going to cut your throat,' and I says, 'No you won't Pat, we can't have any trouble'; I could not get out of the door because my exit was blocked; he was in between the two desks and I could not get out of the room;

he caught me by the throat and held me, and either had a knife or some kind of an instrument, and I tried to shoot him in the arm; I did not want to hurt him; I tried to disarm him; I shot purely and positively to defend myself as I considered my life in danger, and that he was going to cut me with his knife; I was in a corner where I could not get away from him and saw a flash of steel as he made a pass at me in the corner and I could not get out."

Joe Anderson testified for the defendant that he was in the town of Konowa the day of the shooting—

"At the time of the trouble I was right at the door of the building in which they were; the first time I saw Mr. Patton, I suppose that is the party's name, he had a knife going towards Mr. Coleman; he was cursing him, the language he used was too vile to repeat; he called him a vile son of a bitch and said to Mr. Coleman, 'I will cut your throat,' and come at him with a knife in his hand; Mr. Coleman shot him; after the shot was fired I left the place, I did not go in; my home is at Duncan, Okla.; I had met the defendant one time before this at the Majestic Cafe at Seminole; I am in the oil drilling business; have not drilled any wells in the Seminole field; I am preparing to drill a well in Grady county; I was on my way to Seminole when I stopped at Konawa; there was 15 or 20 men I knew around Seminole that wanted an interest in the lease with me, and I told them if I needed money I would let them come in; there was a Mr. Murphy, Mr. Crabtree and a Mr. Banta and others had an interest in it; the name of the nearest town to the lease in Grady county is Marlow, Okla.; when I got to Konowa I stopped near a brick hotel."

Quite a number of pages of the record is taken up by examining and cross-examining Mr. Anderson as to how he happened to be in Konawa the day of the shooting, the substance of which is he met Mr. Coleman on the street a short while before the trouble, and had known

him prior to this time and was going around to see if Mr. Coleman was going with him to Seminole. The foregoing is in substance the material testimony in the trial of this case.

The defendant has assigned several errors committed by the trial court. His argument is directed to the fact that the evidence in this case is not sufficient to sustain the verdict of the jury and that in the examination of the defendant the county attorney persisted in asking the defendant certain incompetent, irrelevant, and immaterial questions which were prejudicial to the rights of the defendant.

The defendant relies on self-defense as a ground to entitle him to an acquittal. The testimony tends to show that the defendant had been working for the prosecuting witness and a controversy arose between them and the defendant had been in the printing office on two occasions prior to the one when the prosecuting witness was shot.

The defendant insists that the prosecuting witness had called him vile names and drew a knife and started toward him with it; at the time the prosecuting witness did this he was between two desks and his exit was cut off and he could not get away from the defendant, and when he fired the shot it appeared to him and he believed it was necessary to shoot in order to keep the defendant from cutting him with a knife, which the prosecuting witness had in his hand; and defendant insists he did not shoot to kill the prosecuting witness, but shot to disarm him and save himself from getting cut with the knife the prosecuting witness had. One of the state witnesses testified, when called in rebuttal, that after the difficulty was over a knife was on the floor near where the prosecuting witness was standing at the time he was shot.

Joe Anderson, who seems to have been passing through the country, and who claims to have seen the difficulty, says the prosecuting witness had a knife drawn on the defendant at the time he fired the shot; the prosecuting witness denies this and says he pushed the defendant toward the door and told him to get out, and he turned away from the defendant and took two or three steps, and the defendant had a pistol pointed at him and fired. This testimony is conflicting as to whether or not the prosecuting witness had the knife at the time and was trying to cut the defendant when he fired the shot. The only testimony in the record that the prosecuting witness did not have the knife in his hand is the testimony of the prosecuting witness himself; the defendant says he had the knife, Joe Anderson says he had the knife, and Jess Cowen, a state witness, says there was a knife on the floor near where the defendant was standing at the time he was shot. There is no testimony in the record, excepting the testimony of the defendant and prosecuting witness, as to what took place just before or at the time the shot was fired. Without setting out the questions propounded to the defendant while on the witness stand, which were objected to by the defendant, it is sufficient to say that many of the questions propounded to the defendant were improper and not material to the issues raised in this case; but after a careful consideration of the questions we do not believe they prejudiced the rights of the defendant, and we hold that the contention of the defendant that the questions propounded to him by the county attorney prejudiced his rights and deprived him of that fair and impartial trial is without sufficient merit to warrant a reversal.

There is a direct conflict in the evidence, and this court has universally held that where there is evidence

from which the jury could reasonably and logically find the defendant guilty of the crime charged, in the absence of unusual circumstances, the court will not set aside the verdict on account of the insufficiency of the evidence. Browning v. State, 31 Okla. Cr. 373, 239 Pac. 272; Wilson v. State, 32 Okla. Cr. 139, 240 Pac. 155; Shields v. State, 32 Okla. Cr. 344, 240 Pac. 661; Tennison v. State, 32 Okla. Cr. 257, 240 Pac. 323.

While there is sufficient testimony to sustain the conviction in this case, there is such a conflict in the testimony, and the testimony of the defendant is so strong tending to show that the defendant acted in his necessary self-defense, we believe the penalty imposed by the jury is excessive, and that a lighter punishment would satisfy the law, and that the sentence in this case should be modified from a term of five years in the penitentiary to a term of three years, and as so modified the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.