Robert D. BLEVENS, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–15928.

Court of Criminal Appeals of Oklahoma.

July 21, 1971.

Philip F. Horning, Oklahoma City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Marvin E. Spears, Asst. Atty. Gen., for defendant in error.

OPINION

BRETT, Judge.

Plaintiff in Error, Robert D. Blevens, was charged, tried and convicted by a jury in the District Court of Canadian County, for the crime of First Degree Burglary, After Former Conviction of a Felony. Plaintiff in Error, hereinafter referred to

as defendant, was tried in a two-stage proceeding, and at the conclusion of the second-stage, he was given the minimum sentence of seven (7) years imprisonment under the direction and control of the Oklahoma State Department of Corrections. Judgment and sentence in District Court case No. 3316 was imposed on April 25, 1969; and from that judgment and sentence this appeal has been perfected.

Defendant was tried twice on this burglary charge. His first trial occurred on May 3, 1968, when he elected to represent himself with court appointed counsel sitting at the table with him. The jury returned a verdict of guilty, but because there was some question concerning defendant's competency, he was granted a new trial.

Defendant was represented at his second trial by Mr. Hugh Rinehart of El Reno, Oklahoma. At the conclusion of the trial, defendant discharged his attorney and again attempted to handle the proceedings himself. When the Motion for New Trial was heard, the trial court appointed Mr. J. L. Pazoureck, Public Defender for Canadian County, to represent petitioner at that hearing. Defendant's Motion for New Trial was denied, and judgment and sentence was imposed.

The Information filed herein alleged that on June 24, 1967, defendant committed the crime of Burglary in the First Degree, by unlawfully entering a certain dwelling house occupied by and in the possession of one Freeman Denwalt, in the Canadian Manor Apartment Building in Yukon, Oklahoma. In the specifications of the Information, it alleged that defendant committed the crime of First Degree Burglary, "* * * *by unlocking an outer door by lifting a latch on said door* and entering therein without the consent of said occupant, with the unlawful, felonious and burglarious intent then and there to commit the crime of assault and battery." (Emphasis added)

Defendant testified in his own behalf at this trial and related that when he reached the Canadian Manor Apartment, the door

to apartment No. 2 was open. He admitted having a tire tool in his hand, but denied that he had any intent to injure any of the parties in the apartment.

The Information was laid under the provisions of Title 21 O.S.1961, § 1431, which defines the offense of Burglary in the First Degree. In prosecuting this case, the State introduced the testimony of three witnesses, each of whom testified that they were present in the apartment on the night in question; that they were awaken by the defendant about 4:00 a. m., in the early morning hours of June 25, 1967; that the defendant had in his hand a tire tool and threatened to harm them bodily; that no one was harmed; that the defendant apologized to Mr. Denwalt and left after drinking a cup of coffee with two of the prosecution witnesses. Those witnesses were: Mr. Freeman Denwalt, the tenant who rented the apartment, and who was also a long time friend of the other two witnesses, Mrs. Jean Laverne, and her fifteen year old son, Larry Laverne.

The facts reveal that defendant was in the process of obtaining a divorce from his wife and had been living with Mrs. Laverne in her home in Oklahoma City for several months. They had a falling out and about 2:00 a. m., on the morning of June 25th, defendant followed Mrs. Laverne to the apartment of Mr. Denwalt. Some two hours later the defendant returned to the apartment house and entered Mr. Denwalt's apartment with a tire tool in his hand. He observed Larry sleeping on the divan, and went into the guest room and awakened Mrs. Laverne; he then went into Mr. Denwalt's room and woke him up, and then required all three persons to sit on the divan in the living room. Mr. Denwalt was the only one of the three witnesses to testify that there was any serious threats made against any of them. However, Mrs. Laverne stated that when he was in her room he asked her, "what in the hell are you doing here?" She informed him that she was sleeping there. Later he slapped her a couple of times and pushed her back into a chair, because she was not getting

dressed fast enough. However, after some conversation in the living room, defendant gave the tire tool to Mr. Denwalt; apologized to him for his misconduct; and then drank some coffee with two of the witnesses, before departing from the apartment complex. The incident occurred early Saturday morning, but was not reported to the police until the following Monday.

The facts reveal further that Larry Laverne and Mr. Denwalt watched television until Larrry went to sleep, and soon thereafter Mr. Denwalt went into his own bedroom and went to sleep. On direct examination he testified that he shut the front door and in response to the question "Do you recall whether you locked the door or not?" he answered, "Well, I thought I locked it. There was a little knob in the center of the door knob and you just pushed that in to lock it, and whenever I let Larry in I just shut the door with the hand behind me and my thumb on that little knob and *I thought I had it locked.*" (Emphasis added) The record reveals that at 2:00 a. m., when Mrs. Jean Laverne reached the apartment, the door was not locked, but shut. She testified that Mr. Denwalt was expecting her, and she shut the door to the apartment and pushed the lock on it, and then went to the guest bedroom and went to sleep. Some two hours later defendant reached the apartment.

Defendant testified that the door to the apartment was open and whether or not the door was open when he reached it became the critical question at defendant's trial. As related, Mr. Denwalt thought he had locked the door; but when Mrs. Laverne reached the apartment the door was unlocked and she went in. The record is clear concerning the fact that if the door was not securely shut, with the latch in place, when the main front door to the apartment building was opened a vacuum condition was created which would force that apartment door open. This fact was testified to by the apartment manager, Mr. Walter Powers and Mr. Bob Luttrell, Deputy Sheriff for Canadian County, and by Officer Cary Thurman of the Yukon Police Department.

On order of the District Judge, the Deputy Sheriff took defendant on April 1, 1969, to Yukon and with the aid of the Yukon Police Officer went to the apartment complex and conducted tests in order to verify whether or not the apartment door would open if it was not latched in place, when the building door was opened. The result of their tests revealed that the vacuum condition would force the door open, if it was not securely closed. The Deputy Sheriff and the police officer used the term "snugly closed." The record reveals that the prosecutor was very perturbed over the fact that the Deputy Sheriff took defendant out to conduct the tests; and as a result, the District Attorney for Canadian County made very caustic remarks to Deputy Sheriff Luttrell in the hallway outside the courtroom, in front of the court clerk's office.

A hearing was held in the judge's chambers to ascertain how the question would be put to the jury to determine whether or not any of the members of the jury overheard the District Attorney's remarks.[1]

---

1. Defense counsel inquired of Deputy Sheriff Luttrell:

"Q. All right. Now, tell the Court what [the District Attorney] said to you.

A. Well, he walked up to me and he said, 'I'll have you to know, young man, that I think, and I'll tell you just like I told this reporter here, that I think the Sheriff's office give the District Attorney's office a screwing on this case.'

Q. Is that all?

A. He said other than that, he said, 'Taking this defendant out for a joy ride.'

Q. All right.

A. He also said that there was no order from the Court. I tried to advise him that there was an order filed. At that time Don Dresser walked up and told him that there was an order filed in the Court Clerk's office to this effect and asked him to hold it down because there was a juror present." (Tr. Ev. 131–132)

When court was reconvened, the jurors were asked to raise their hands if any of them heard any remarks made by either counsel in the hallway during the recess. None raised their hands indicating that they had heard remarks made by either the prosecutor or defense counsel.

After the jury returned its verdict, but before the hearing on the defense Motion for New Trial, it was brought to the defense attorney's attention that the prosecution had obtained and had in its possession, the lock from the door of the prosecuting witness's apartment. It seems apparent that the prosecuting attorney obtained the lock before the trial was commenced, and that it was in his desk-drawer during the time defendant was being tried.

In his brief defendant sets forth five propositions of error, as follows:

1. He was denied a fair trial because the prosecuting attorney illegally suppressed evidence favorable to him.

2. He was denied a fair trial because of the misconduct of the prosecuting attorney in making statements regarding the case in the presence of jury members during recess.

3. He was denied a fair trial due to the unresponsive and prejudicial remarks of a prosecution witness connecting the appellant with an unrelated crime.

4. He was denied a fair trial for the failure of the trial court to hold a hearing regarding his mental competency.

At the outset it appears that the first proposition of error is the most critical of those specified in defendant's brief. Defendant contends that the door lock constituted a very important item of evidence in support of his defense; and that the prosecution was obligated to disclose the

lock to the defendant; and the failure to do so constituted an unconstitutional deprivation of defendant's right to a fair trial. The State replies to this contention by asserting, that defendant failed to prove that the District Attorney had *"the lock"* which was on the door at the time of the incident involved in this trial. The State replies further, "And even if it had been proved that the District Attorney had the lock involved herein, that the defendant would not have been denied any constitutional rights since his attorney testified that the only purpose he would have used the lock for at the trial would have been to show the jury the kind of lock involved."

At the hearing on the Motion for New Trial defense counsel asked the apartment manager, Mr. Powers, " * * * did Mr. Bloodworth take the lock from the apartment door at that time?" Mr. Powers answered, "yes." On cross-examination Mr. Powers again stated, "He took the lock that had been on that door." The prosecutor then made it appear as if it was possible that the door lock was from another door, instead of the one on apartment 2, when this burglary charge arose. The prosecution asked, "Are you positive it is the same lock, or could it have been some other lock?" Mr. Powers answered, "Oh, it possibly could have been, as I recall."

While a criminal trial is conducted through an adversary system, it is not a game; nor is it intended to be a contest of wits between opposing counsel. The fundamental purpose for a criminal trial is to search for the truth. If the person charged has committed a crime, then he should be punished for having committed that crime. The United States Supreme Court stated in Brady v. Maryland, 373

---

This conversation was verified in substance by the Court Clerk, Mr. Don Dresser, including the word "screwing."

The District Attorney made a statement under oath in which he related that he didn't want to say anything to the newspaper reporter that he wouldn't say to the Deputy's face, so he walked to the Deputy and made his remarks. He stated that he used the phrase, "I think you fellows are trying to give the District Attorney's office a raw deal."

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963):

"The suppression by the prosecution of evidence favorable to and requested by an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Admittedly, the lock was not requested by defendant because he did not know that it had been removed and was in the possession of the District Attorney. We believe, insofar as the District Attorney had possession of the lock in question, he had a duty to make it available to the court and the jury at defendant's trial. But instead of doing this, the prosecution proceeded to use the door in the courtroom to demonstrate how the lock might or might not have worked. Under the circumstances we consider this to be a fundamental error, and sufficient cause for the reversal of this conviction. In his brief defendant cites Application of Kapatos, 208 F.Supp. 883 (S.D.N.Y.1962) as follows:

"The purpose of the trial is as much the acquittal of an innocent person as it is the conviction of a guilty one. The average accused usually does not have the manpower or resources available to the state in its investigation of the crime, nor does he have access to all of the evidence, much of which has usually been removed or obliterated by the time he learns that he is to be tried for the crime."

Such was defendant's situation in that he had been brought back from the state penitentiary, and was incarcerated in the Canadian County jail to stand trial the second time. Had it not been for the order of the District Judge, which permitted the Deputy Sheriff to take defendant to the apartment, in order to verify the condition of the door, there would have been little defense available for him. In this respect defendant cites United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964), in which that Court declared that the prosecution was bound to disclose to the accused the existence of two eye witnesses who would have testified that the prisoner had not participated in the crime. In that case the Court of Appeals for the Second Circuit cited Brady v. Maryland, *supra*.

In support of this proposition in the instant case, defendant cites States v. Fowler, 101 Ariz. 561, 422 P.2d 125 (1967), as a case very similar to the instant one. In the Fowler case the defendant was convicted of First Degree Murder, notwithstanding the fact that defendant contended that the killing was justified on the grounds of self-defense. No evidence that. the deceased was carrying a weapon at the time of the shooting was present at the trial. However, after the trial was completed, defense counsel learned that the police had discovered a knife at the crime site; and that it had remained in their custody. In reversing Fowler's conviction the Arizona Supreme Court said:

"Both prosecution and the police, as public officers acting on behalf of the state, are sworn to uphold the law and are duty bound to protect the rights of the innocent as well as to prosecute the guilty. Their primary duty is not to convict, but to see that justice is done. * * * A prosecutor who fails to reveal evidence that clearly would aid the accused's defense would seem to have lost sight of his proper objective."

The Supreme Court of Arizona stated further, with reference to the conduct at the trial itself:

"The trial of a capital case, or indeed any trial, no longer can be considered properly a game of wits and skill. A man faced with the possible prospects of losing his life or being subjected to an extended prison term should not be denied, at the whim of the state, evidence which may be vital to this defense." See: Curran v. State of Delaware, 3 Cir., 259 F.2d 707, 711

We are unable to say at this time whether or not the lock might have changed the jury's verdict; but the record does reveal that the jury requested the reading of the testimony of the defendant and both police officers. This request was denied by the trial court, when neither counsel objected to his denial of the request. Consequently, it seems likely that had the jury viewed the faulty lock, that evidence might have tipped the scales in defendant's favor. We therefore conclude under the circumstances in this case, that it was reversible error for the State to suppress the use of the faulty lock at defendant's trial.

With reference to defendant's fifth proposition that the evidence does not support the jury's verdict, as we view the record it contains some merit. There is sufficient conflict between the testimony of the State's three witnesses, concerning whether or not the door was securely closed; when viewed with all of the other facts of this case, the State failed to prove that the door was closed and locked; and consequently failed to produce positive proof that defendant entered the apartment "by unlocking an outer door or by lifting a latch on said door to the Denwalt Apartment," as alleged in the Information. Likewise, the testimony leads us to believe that any intent on defendant's part, to commit assault and battery, was premised upon the condition if he found his lover living with Denwalt. When defendant learned otherwise, he apologized to Mr. Denwalt, and the others; and then left without committing any felonious assault and battery. The record reflects also, that after this alleged crime occurred, defendant spent several nights with Mrs. Laverne, at the Sun-Tide Motel.

Therefore, for the reasons herein set forth, we are of the opinion that this conviction must be reversed.

It is so ordered.

NIX, J., concurs.