**Herbert Claude FIELDS and Jimmy Louis Phillips, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–16507.**

Court of Criminal Appeals of Oklahoma.

July 26, 1972.

Rehearing Denied Aug. 8, 1972.

Don Anderson, Public Defender, Oklahoma County, for appellants.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., for appellee.

## OPINION

SIMMS, Judge:

This is a joint appeal from a joint conviction in the District Court of Oklahoma County, Oklahoma, in Case No. CRF–70–2375, wherein convictions were had for the crime of Rape in the First Degree, After Former Conviction of a Felony, in a two-

stage proceeding and the jury assessed punishment at a term of 1,000 years.

We affirm.

On the trial, the prosecutrix, Karen Lee Kimbrough, a 28-year-old Caucasian female, testified that she was an employee of a German cosmetic firm and that she was visiting her parents in Norman, Oklahoma, and was in the company of her boyfriend, one Ralf Bottger. She testified that on the date in question, August 11, 1970, she and Ralf visited some friends in Oklahoma City and left by auto between midnight and 12:30 A.M. to return to Norman. She testified that they experienced battery trouble and three Negroes, two of them whom she identified in open court as the appellants, stopped and offered to help them.

The Negroes indicated they would take them to get a "jumper cable" and as the couple got into the car, one of the Negroes invited them to have a beer and the five persons, the prosecutrix and her date, and the three Negroes proceeded to a tavern called "The Place" at 16th and Miramar, arriving at approximately 1:15 A.M. The prosecutrix testified that there were approximately twenty customers present in the establishment, but that she and her boyfriend were the only Caucasians. Her testimony was to the effect that the group shared mixed drinks and that she was soon on a first name basis with the two defendants whom she knew at that time as "Jim" and "Charles," and that the party remained at The Place for approximately two and one-half hours, leaving in the vicinity of 3:15 A.M. and returning to the stalled automobile.

The automobile would not start, and at the suggestion of one of the three Negroes, they proceeded east on 23rd Street to get a "jumper cable" from one of the men's relative's gas station. The prosecutrix testified that she sat in the middle of the back seat with her date on one side and a Negro male on the other, while the other two Negroes occupied the front seat of the vehicle. She testified that after two turns, the automobile stopped and the defendant

Fields wanted a push, so that everyone but the prosecutrix alighted from the car and pushed. At that point the automobile started and the two Negroes jumped in and closed the door, leaving her male companion outside of the automobile. She testified that her companion then jumped on the back of the car and Fields said to Phillips, "Get the pistol out," but that she never did see a gun.

She testified that after a short distance the automobile stopped, she jumped out of the car and tried to run, but was caught and dragged back to the car. The car started off again, her male companion hanging by his elbows from the driver's window and he was finally dislodged and the car drove on for approximately three minutes, at which point the vehicle stopped. She testified she was taken out of the car, raped successively by all three Negroes, who then drove off. She testified she started toward some lights, soon encountered her male companion and then proceeded to a farm house where the police were notified.

Dr. James Harlan Hart testified he examined the prosecutrix on August 12, 1970, at St. Anthony's Hospital and that his examination revealed that she, at that time, was wearing torn clothing, that she had abrasions on the right side of her neck, the left knee and lower leg, and over the right eye. He noted there were no tears of the pelvic area, that he did find live sperm in the vagina, and that she was almost to the point of hysterical shock.

The testimony of her male companion did not differ substantially from that of the prosecutrix, except that he did not testify concerning any of the events between the time he was dislodged from the moving vehicle and the time he again encountered Karen after the Negroes had driven away.

Officer Blair of the Oklahoma City Police Department testified he conducted an investigation of the matter and had photographs taken of the victim at the police station. He also gave defendant Fields'

age as 30, and defendant Phillips' age as 22. The State rested its case.

For the defendants, Mary Sue Campbell testified that she was 25 years old, lived at 1211 N. Geary, and was Phillips' girlfriend. She testified that on the evening in question, Fields and Phillips came to her house at approximately 6:30 P.M., visited for awhile, and that she then accompanied them as they drove around, got some beer, returned to her house and played some music. She testified that at approximately 2:00 A.M., she, Frank Brown, and the two defendants went to "The Spot" where they stayed until approximately 3:00 A.M. She also stated that Fields then drove her and Phillips to his home at 415 Eleventh Street and left them. She testified she stayed the rest of the night at Phillips' residence, leaving at approximately 7:00 A.M. She was able to fix the date as August 11, because she was supposed to go to school that day.

Sandra Jean Walker testified that she was Mary Sue Campbell's sister and was home on the evening in question and saw the two defendants at that place. She stated they stayed until it was "pretty late."

Jimmy Louis Phillips testified on his own behalf that on the evening in question, he and Fields went to Mary's house at approximately 6:30 P.M., and that he, Frank Brown, Mary and Fields went out and got some beer, returned to Mary's house and stayed until approximately 3:00 A.M., when Fields drove him and Mary to Phillips' house and left them there. He stayed at Mary's, spent the night there, and he denied having seen the prosecutrix prior to the preliminary hearing, denied being with her, denied ever having seen or been with the German boy any time on August 12.

Herbert Claude Fields testified in his own behalf that on the evening in question, he and Phillips were visiting at Mary Campbell's house with several others. His testimony was substantially the same as that of Phillips, with the added factor that he admitted ownership of a 1960 white Oldsmobile registered in his name. He de-

nied having been at "The Place" club on August 11 or the 12th and denied having told one Officer DeLaughter that he had been at the "Top Hat Club" and the "Razz Club" on the night in question.

On rebuttal for the State, Officer DeLaughter testified that he talked to Fields at the Oklahoma City jail on August 12th, 1970, and that after giving the Miranda warning, Fields denied the rape and told DeLaughter that he had been at the "Razz Club" and the "Top Hat Club" on the evening in question.

Officer Cooper testified that on August 12, 1970, he was riding patrol and that at approximately 1:30 A.M. he noticed a car stalled at 23rd and Bryant occupied by a white male and female. He testified that he saw three Negroes drive up in a white Oldsmobile and offer help. Soon all five got into the Oldsmobile and drove off, at which point the officers fell in behind and followed the Oldsmobile until they discovered it parked at "The Place" at 16th and Miramar. The Olds registration checked to a Herbert Claude Fields at which point Officer Cooper called for other officers to go inside "The Place."

Jess W. Stewart testified that he was a patron at "The Place" at approximately 3:00 A.M. on the morning in question. He stated that while there he saw the two defendants in company with persons named "Karen" and "Ralf" and that he saw them leave together. He also admitted two previous felony convictions.

Officer Harper of the Oklahoma City Police Department testified that he was called and went to "The Place" at 16th and Miramar at approximately 1:30 A.M. on August 12, 1970. He testified that upon entering the club, he saw the defendants seated in a booth with several other persons. He also testified to the presence of two Caucasians in the bar.

On the second stage of the trial, after finding of guilt, the defendants stipulated the previous felony convictions.

The appellants' assignments of error all run to the 1,000 year sentence imposed by

the jury. The propositions, in the order asserted, are that the sentence of 1,000 years constitutes cruel and unusual punishment; that the sentence is excessive; that the sentence deprives the appellants of equal protection of the law; and, that the 1,000 year sentence is an encroachment upon the executive branch.

In addition to the excellent brief submitted by the Oklahoma County Public Defender, Don Anderson, this Court considered the "pro se" pleadings to be wholly without merit and the authorities presented therein to be non-persuasive in the case at bar.

Inasmuch as the propositions asserted are interrelated, they can be disposed of in a collective manner.

Appellants were convicted of the crime of First Degree Rape, After Former Conviction of a Felony. Rape in the First Degree is punishable by death or imprisonment in the penitentiary, not less than Five (5) Years in the discretion of the jury, or in case the jury fails or refuses to fix the punishment, the same shall be pronounced by the Court. 21 O.S.1971, § 1115. Further, under the Oklahoma Statutes dealing with second and subsequent offenses, if the offense of which such person is subsequently convicted is such that upon a first conviction an offender would be punishable by imprisonment in the penitentiary for any term exceeding five (5) years, such person is punishable by imprisonment in the penitentiary for a term not less than ten (10) years, and could have imposed the ultimate punishment of death, or any number of years under the statute.

The Oklahoma Statutes, in such instances where no maximum punishment is decreed, may also impose imprisonment for the natural life of the defendant. Title 21, O.S.1971, § 62, states:

"Whenever any person is declared punishable for a crime by imprisonment in the penitentiary for a term not less than any specified number of years, and no limit to the duration of such imprisonment is declared, the court authorized to pronounce judgment upon such conviction may, in its discretion, sentence such offender to imprisonment during his natural life, or *for any number of years not less than such as are prescribed."* (emphasis added)

Counsel for appellant makes no argument with regard to whether or not life imprisonment under the facts and circumstances before us would have been cruel, unusual, or excessive. However, the practicalities of life compel us to observe that a sentence of 1,000 years is, for all intent and purposes, a life sentence.

Further, we have previously held that a sentence of 150 years in the state penitentiary assessed in an armed robbery case was not cruel and unusual punishment, on the basis that it extended beyond the span of life presently allowed to a human being, and that it was not so excessive as to shock the sense of mankind. Judge Tom Brett so stated in writing the opinion for the Court in Seibert v. State, Okl.Cr., 457 P.2d 790 (1969).

That same year, we held that the imposition of life imprisonment upon conviction of murder does not constitute cruel and unusual punishment in violation of the United States Constitution. Lewis v. State, Okl.Cr., 449 P.2d 930 (1969). *Lewis* supra, also stands for the proposition that the fixing of penalties for crime is a matter within the legislative function, and that where a sentence imposed upon conviction is within the limits authorized by the statute it is not cruel and unusual punishment.

These precedents lead us to adopt the holding expressed in Haskins v. United States, 433 F.2d 836 (10th Circuit, 1970); that a sentence will not be disturbed on appeal nor considered as cruel and unusual punishment if it is within the statutory limits.

This brings us to the statutory limits, and where the statute provides no fixed maximum, it could be argued that a jury panel could assess a term of 25,000 or a million years, if they chose to do so.

Since the jury cannot be condemned for acting within the limits set out for them by the law, and since it is reasonable to expect that same jury knew the average life span of a man, then there must have been some additional consideration involved in the jury's affixing the 1,000 years time such as an attempt to indicate outrage at the facts and circumstances of the case and in some way to serve as a deterrent.

■ The matter of sentencing and the statutes which govern same are within the purview of the Oklahoma Legislature, and if changes are to be made in the structure of sentencing, they are to be made by that same Legislature. Noting the Supreme Court's recent. pronouncement with regard to capital punishment, it is our hope that the Legislature will re-examine the Oklahoma Statutes with regard to punishment and perhaps consider whether or not the maximum penalty should be assessed in certain clearly defined cases.

■ Appellants further claim that the 1,000 year sentence deprives them of equal protection of the law. Oklahoma's parole policy as expressed in 57 O.S.1971, § 332.7, provides:

"Upon completion of one-third (⅓) of the sentence of any person confined in a penal institution in the State of Oklahoma such person shall be eligible for consideration for a parole, and it shall be the duty of the Pardon and Parole Officer, with or without application being made, to cause an examination to be made at the penal institution where the person is confined, and to make inquiry into the conduct and the record of the said person during his confinement in said penal institution, and thereafter . . . report to the Pardon and Parole Board his findings, which shall be considered as a basis for consideration of said person for recommendation to the Governor for parole."

Appellants contend on the basis of the above-cited statutory provision, the so-called "Forgotten Man" statute, that they would have to wait some 333 years and 4 months before having any possibility of parole consideration, and in effect, the 1,000 year sentence effectively repeals the statute, insofar as they are concerned.

We are unable to find any merit in this contention, particularly in view of the policy of the Pardon and Parole Board recently stated in that body's rules and filed in the office of the Secretary of State during the month of June, 1972. That Board's policy reflected in the final paragraph on the first page reads as follows:

"Pursuant to the 'Forgotten Man Act,' Title 57, Sec. 332.7, O.S.A., every inmate must be considered for parole on or before the expiration of one-third of his maximum sentence in such a manner as the Board may determine. Further, pursuant to Title 57, Section 355, Oklahoma Statutes Annotated, it is the intent of the Board that any inmate serving forty-five years or more, including a life sentence, shall be considered for parole or clemency after serving fifteen years."

■ That policy is also dispositive of appellant's final contention that the 1,000 year sentence is an encroachment upon the executive branch. Under that final proposition, appellant contends the jury exceeded its proper function in speculating about the possibility of parole, and cites as authority. French v. State, Okl.Cr., 397 P.2d 909 (1964); and Williams v. State, Okl.Cr., 461 P.2d 997 (1969). Those cases deal rather with the instructing of the jury on the possibility of parole, or the policies of the Pardon and Parole Board, or of the explanation of the instructions given to the jury in those areas. Those cases do not stand for the proposition that the jury exceeds its proper function in speculating about the possibility of parole.

Inasmuch as the court and jury remained within the statutory punishment guidelines set by the Legislature for the crime in the case at bar, and imposed a term which has the practical effect of a life sentence, in view of the Pardon and Parole Board's policy, we find that the jury's verdict is proper and should stand.

Statutory remedies for the so-called "Texas Verdict" are a matter within the purview of the Legislature. Sills v. State, 472 S.W.2d 119 (Tex.Cr.App.1971).

In addition to our consideration of the briefs and authorities presented herein, careful reading of the record revealed no error which would justify modification or require reversal. The judgment and sentence is, and the same is hereby, affirmed.

BUSSEY, P. J., concurs.

BRETT, Judge.

I concur that the judgment should be affirmed, but I would modify the sentence to life imprisonment.