**Larry STUART, a/k/a Larry Wayne Stuart, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–73–299.**

Court of Criminal Appeals of Oklahoma.

April 29, 1974.

Rehearing Denied May 29, 1974.

A. Francis Porta and James C. Bass, El Reno, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., M. Joe Crosthwait, Jr., Legal Intern, for appellee.

OPINION

BUSSEY, Judge:

Appellant, Larry Wayne Stuart, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Canadian County, Case No. CR–72–44, for the offense of Manslaughter in the First Degree. His punishment was fixed at life imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

For several months defendant had lived in a house at 1509 East Rogers in El Reno, Oklahoma, with a woman by the name of Lewellyn Norton, the sister of the deceased. They were apparently happy together until the release from prison of her brother, Newell Winn Nye, the deceased. When Miss Norton asked defendant to allow her brother to move in with them, defendant strenuously objected to having an ex-convict reside with them. When Miss

Norton brought her brother to the house to move in, defendant became so incensed that he moved out of the house. He, thereupon, went on a binge of drinking and pill-taking which lasted two or three days, up until the time of the homicide. Defendant testified that his last memory, before his arrest after the homicide, was that he pulled up a tree in front of the house on Tuesday night before the homicide. During the evening of January 19, 1972, defendant went to P. J.'s Bar in El Reno, where he met a friend, Ronnie Hicks. Hicks testified that the two drank beer and whiskey at P. J.'s and at another bar, the Reno Rancho, from that time until approximately 2:00 o'clock the next morning.

Shirley Smith testified that she had seen defendant at the Reno Rancho Club the evening of January 19, 1972, at around 8:00 p. m. She stated that defendant, on being asked a question about Miss Norton, said, "I'm tired of her and her son-of-a-bitching brother," and also, "I'll get them." In answer to Miss Smith's remark that defendant and Miss Norton could get back together, defendant replied, "No, I'll get the sons-of-bitches if it's the last thing I do." Miss Smith testified that it was her opinion that the defendant was not drunk at the time of the above conversation with her.

After leaving the clubs, defendant and Donnie White went riding around in defendant's pickup truck with defendant driving. They drove past the house at 1509 E. Rogers two or three times. Defendant drove Donnie White home without any guidance or assistance. At White's home, they finished off a pint of whiskey they had been drinking while driving, and shot out street lights with defendant's .22 rifle. Hicks identified State's Exhibit No. 11, the alleged murder weapon, as the same rifle. Defendant then took Hicks home around 3:00 a. m., indicating that he might return to Miss Norton's home.

Hicks testified that defendant was pretty drunk at that time, and in Hicks' opinion,

did not know right from wrong. The next occurrences were related in the testimony of Lewellyn Norton. She testified that she and her brother were awakened sometime on the morning in question, by a loud noise. She went into the living room and found defendant crawling through a hole which had been kicked in the front door. She stated that when defendant came through the front door he "looked pretty mad"; his "eyes looked wild" and his "eyes looked funny like he was taking pills." She also stated that during their relationship, they had both taken bennies.

After coming through the door, defendant knocked Miss Norton down with the back of his hand and, rifle in hand, went back to the bedroom where the deceased was staying. An argument ensued and she heard her brother say, "You don't want to kill anyone." Defendant returned to the living room and left by crawling back through the hole in the front door. The deceased, a carpenter, took his tool box and hammer and repaired the damage to the front door and decided to go ahead and dress for work, as it was near the time that he was to meet his ride. He and Miss Norton were talking when several shots came through the bedroom window. Miss Norton testified she heard a loud noise and looked into the living room to see defendant climbing in through the hole which had again been kicked in the front door. The deceased slammed the bedroom door shut and held it closed. As Miss Norton attempted to move toward the back bedroom, she heard "firecracker noises" and other loud sounds. She then heard her brother say, "Larry, you've shot me." The reply was, "And I'm going to shoot you again." She fled through the back of the house and went to a neighbor's to call the police.

The next person to see defendant was Ronnie Hicks, who testified that he was awakened by defendant that morning. Defendant told him he had gone to Miss Norton's house and thought he might have shot her brother through the bedroom door. He gave the .22 rifle to Hicks at that time. Defendant then apparently went to his mother's house and went to sleep in a tin shed in the backyard. He was found there asleep several hours later by his brothers, Dennis and R. L. Stuart, who had been notified of the homicide and had received permission from the police department to bring in the defendant.

Dennis Stuart, a policeman at Tinker Air Force Base, testified that he had had experience in identifying people under the influence of drugs and alcohol on his job. He stated that the defendant did not appear to be conscious of what was going on around him when first aroused, and in his opinion, the defendant was at that time under the influence of either, or both, alcohol and narcotics. He further testified that he got the .22 rifle, mentioned above, at Ronnie Hicks' house and turned it over to defense counsel at his law office.

At the trial, defendant called as a witness, Dr. Sam Collins, a registered psychiatrist. He said that he had been seeing defendant for almost a year, commencing about two months after the homicide. It was Dr. Collins' opinion that defendant did not have the capacity to form the intent to murder at the time of the homicide. He based this opinion on what he termed a "thinking disorder" which kept defendant from understanding the nature and probable consequences of his acts, or from knowing right from wrong.

After deliberation, the jury returned a verdict of guilty of Manslaughter in the First Degree and set punishment at life imprisonment. The court instructed the jury that this verdict form was not in conformity with the instructions earlier provided them. The jury was then asked to return to the jury room and bring back a verdict consistent with the instructions. After ordering the jury to return another verdict, the court decided it had been mistaken in not accepting the second verdict returned, which was a finding of guilty and a sentence of 99 years imprisonment, which was not recorded. The original verdict was then read and the individual jurors polled as to whether this was their verdict. All answered in the affirmative.

Defendant asserts ten propositions of error on appeal, which we shall discuss in the order in which they appear in his brief.

In his first assignment of error, defendant challenges the procedure followed by the District Court in drawing the names from the jury wheel. We will first review the applicable statutory language pertaining to the selection of jurors and then compare that language to the procedure which was actually followed in the instant case in order to determine whether there is any merit to defendant's assertion of error.

The procedure to be followed in drawing prospective jurors' names from the jury wheel is set forth in 38 O.S.1971 § 21, the pertinent part of which reads as follows:

"At such times as the chief District Judge or the available judge of a court of record of the county may order, the court clerk or one of his deputies and the sheriff or one of his deputies *in open court* and under the directions of the chief District Judge or the available judge of a court of record of the county shall draw from the wheel containing the names of jurors . . ." [emphasis added]

The pertinent part of 38 O.S. § 29, further provides:

"*Substantial compliance* with the provisions of this Chapter, shall be sufficient to prevent the quashing or setting aside of any indictment of a grand jury chosen hereunder, unless irregularity in drawing, summoning or empaneling the grand jury resulted in depriving a defendant of some substantial right, . . ." [emphasis added]

Thus, if defendant can show that either the procedure followed below was not in substantial compliance with 38 O.S.1971 § 21, or that it deprived him of some substantial right, his assignment of error has merit.

It appears that the jury drawing procedure actually followed below was as follows: the district judge, court clerk, and sheriff met in the district courtroom. The court bailiff was posted outside the closed courtroom doors with orders to prevent anyone from entering while the drawing was underway. However, the drawing was visible to the public through the glass windows of the courtroom doors. There was no evidence at any time that the three officials involved were not acting in good faith, nor was there any suggestion of irregularity at the time of the drawing other than the fact that the public was physically excluded from inside the courtroom while the drawing was conducted.

Defendant's position is that the drawing was not "in open court" as per § 21, nor was it in "substantial compliance" as per § 29. Defendant further argues that the lack of substantial compliance relieves him of the burden prescribed in § 29 of showing that the irregularity deprived him of some substantial right. The State's position is that the drawing was in substantial compliance with the statutes, and that defendant has failed to meet the burden thereby placed upon him of showing substantial prejudice.

We feel that the procedure used below was in substantial compliance with the statutes for several reasons. First, it is our task to construe statutes liberally to effect the objects for which they were enacted. Gravitt v. State, 44 Okl.Cr. 45, 279 P. 968 (1929). We must, accordingly, lend a liberal construction to the terms "in open court" and "substantial compliance" so as to give effect to the primary purposes of the jury drawing statutes. In our view, that purpose was to insure that jurors would be drawn fairly and impartially, in order that there could be no suspicion that the jurors had been secretly handpicked. Young v. State, 41 Okl.Cr. 226, 271 P. 426 (1928). We see no objection to allowing the public to observe the drawing from behind the railing in the spectator area of the courtroom as urged by defendant. But *the fact that we approved just such a procedure in Dowell v. State, 96 Okl.Cr. 62, 248 P.2d 256 (1952), does not make it the exclusive means of achieving substantial

compliance with the statutes. The fact that the drawing was done in good faith and in full view of the public negates any imputation of partiality or handpicking. We conclude, then, that the statutory requirement of substantial compliance was met. In the absence of a showing by defendant that any substantial right was violated, we must reject his first assignment of error.

■ Defendant's second allegation of error is based on the failure of the State to produce the hammer mentioned in the statement of facts above. Defendant claims the State illegally suppressed evidence so as to commit reversible error. We disagree for two reasons.

First, there was no evidence other than the unsupported hypothesis of defense counsel that the hammer played any material part in the death by gunfire of deceased. Second, the principal case cited by defendant, Blevens v. State, Okl.Cr., 487 P.2d 991 (1971), is distinguishable. There, the evidence was knowingly suppressed by a prosecutor who had it in his possession throughout the trial. Here the record shows that the prosecutor did not have the hammer in his possession when its production was demanded by defendant. A more important distinction is that in Blevins, supra, the evidence in question, a latch allegedly unlocked by a defendant charged with First Degree Burglary, was critical to his defense. Here, as stated above, the hammer was marginally important to the defense at most. We, thus, reject defendant's second assignment of error.

■ In his third assignment of error, defendant alleges error in trial court instruction number 6, which pertained to the defense of insanity or temporary insanity at the time of the homicide. The instruction objected to reads as follows:

"You are further instructed that as one of his defenses herein the defendant contends that he was temporarily insane and deprived of reasons at the time of the death of the decedent.

In this connection you are instructed that the law presumes every person to be sane and of sound mind, able to distinguish between right from wrong as applied to any particular act, and to understand the nature and consequences of the act.

This presumption will prevail until such time as evidence is introduced by the State or by the Defendant sufficient to raise in your minds a reasonable doubt of defendant's sanity at the time of the incident alleged in the Information and if such reasonable doubt arises, the presumptions cease, whereupon the burden of proof is upon the State to prove such a state of sanity of the defendant as would make him criminally liable by competent evidence beyond a reasonable doubt before you would be justified in convicting the defendant of the *crime charged in the Information.* [emphasis added] In this further connection you are instructed that although one may be in an unsound condition of mind, brought about by any temporary condition, either real or imaginary, if at the time such person commits a criminal act, he is capable of knowing and understanding the nature and character of such act and its natural consequences, and further that it is wrong, then and in that event such unsound condition of mind is not sufficient to exempt or exonerate him from criminal liability."

Defendant's objections to this instruction center around the underlined portion of the third paragraph. He claims that this instruction failed to advise the jury that acquittal on the defense of temporary insanity was possible on a charge of First Degree Manslaughter, Murder being "the crime charged in the Information."

■■ Defendant cites his requested instruction number 2 as being preferable to the trial court instruction number 6. The requested instruction reads as follows:

"You are instructed that an insane person is not responsible for his acts committed when such mental condition exist-

ed. The test of criminal responsibility for acts, which would ordinarily be criminal under the law, is:

The mental ability or capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and probable consequences of such acts, that is to say, the capacity to know right from wrong, and to know then that the particular act, alleged to have been committed, was wrong. You are instructed that in addition to his plea of not guilty there is the further defense in this case that the defendant was at the time of the commission of the alleged offense insane, and in this connection you are instructed that an insane person cannot be held liable for the commission of a crime, that is that a person who is unable to distinguish right from wrong and to know the probable consequences of his acts is an insane person; but you are instructed that the defendant is presumed to be sane which presumption will prevail until evidence is introduced by the state or by the defendant to raise a reasonable doubt of the sanity of the defendant, at which time the presumption of sanity ceases and the burden of establishing the sanity of the defendant is cast upon the state, and that the state must prove the sanity of the defendant in the manner and to the extent that any other material matter must be proven; and if upon a consideration of all the evidence, facts and circumstances which have come to your attention during the trial you have a reasonable doubt as to the sanity of the defendant at the time of the alleged offense, you are instructed that you must give the defendant the benefit of that doubt and so state in your verdict, a proper form of same will be furnished you, in other words as heretofore instructed, you must find and believe from the evidence beyond a reasonable doubt that at the time of the commission of the alleged offense that the defendant was sane to the extent he was able to distinguish between right and wrong and to

know and understand the nature and consequences of the act he was committing and the probable consequences thereof, in order for you to find the defendant sane."

There is no question but that defendant's requested instruction is a correct statement of the law regarding the defense of temporary insanity. As he points out in his brief, the first two paragraphs in the instruction are identical to language in an instruction approved by this Court in Dare v. State, Okl.Cr., 378 P.2d 339 (1963). The last paragraph is identical to language in an instruction approved in French v. State, Okl.Cr., 416 P.2d 171 (1966). We feel, however, that the instruction given by the trial court was a complete, accurate, and proper statement of the law regarding the defense of temporary insanity in light of the evidence presented. In like situations, this Court has repeatedly upheld on appeal a trial court's refusal to give an additional requested instruction. See Fish v. State, Okl.Cr., 505 P.2d 490 (1973), citing York v. State, Okl.Cr., 449 P.2d 927 (1969). We adhere to two rules often relied upon by this Court. First, no one instruction states all the law, and instructions in a given case must be considered as a whole. Williams v. State, Okl.Cr., 478 P.2d 359 (1970); United States v. Fletcher, 444 F.2d 619 (10th Cir. 1971). Second, challenged instructions are to be construed in light of the evidence presented. *Fish*, supra, and Rhodes v. State, 30 Okl.Cr. 2, 234 P. 645 (1925). Thus, in order to sustain defendant's objections to instruction number 6, we would have to find that neither the entire set of instructions given by the trial court, or the evidence produced at the trial, sufficed to inform the jury of two things: one, that the defense of temporary insanity could possibly lead to acquittal, and two, that it could also be applied to lesser included offenses such as First Degree Manslaughter.

Our review of the other instructions given reveal one which states that insane persons are incapable of committing *crimes* [emphasis added]. Another instruction re-

quired the jury to inquire into the *mind* of the defendant in order to determine the *grade* of the homicide [emphasis added]. A third instruction required a not guilty verdict in the event that the jury entertained a reasonable doubt as to guilt of either Murder or First Degree Manslaughter.

These instructions, when considered as a whole, together with the evidence introduced at trial centering around the state of defendant's mind at the time of the homicide, were sufficient to properly focus the jurors' minds on the defense of temporary insanity. We, therefore, find defendant's third proposition of error to be without merit.

In his fourth assignment of error, defendant cites several "subtle acts" on the part of the prosecutor, designed to prejudice the jury against defendant. Four such incidents are singled out in defendant's brief. The first two involve the same question asked of defendant and then of Dr. Collins, as to their knowledge of why defendant had not had himself committed for state mental examination before trial. The trial court sustained defendant's objections to the questions both times they were asked. The third incident concerned the prosecutor's use of the rifle and the bedroom door, both exhibits, in an attempt to demonstrate to the jury his version of how the defendant had rammed the rifle through the door and fired the fatal shot. The trial court sustained defendant's objection to the demonstration as being argument on matters not within the evidence presented, and admonished the jury to that effect. The fourth incident was a late remark by the prosecutor that the defendant, himself, had told Ronnie Hicks that he had shot the decedent through the bedroom door. Defendant's objection was overruled. The court also overruled defendant's Motion for Mistrial after each of the above four incidents.

■■ Reversal because of argument by counsel for the State is proper only where such argument is grossly improper and un-warranted on some point that may have affected defendant's rights. Bell v. State, Okl.Cr., 381 P.2d 167 (1962). We have repeatedly held that the right of argument in criminal prosecutions contemplates liberal freedom of speech and wide range of discussion, illustration and argument in discussing the evidence and the reasonable inferences therefrom. Franks v. State, Okl. Cr., 514 P.2d 92 (1973). Cases cited by defendant are distinguishable in that in each the prosecutor's actions were much more likely to prejudice the jury and, given the closeness of the cases, were far more likely to have produced the convictions. See Daney v. State, Okl.Cr., 370 P. 2d 44 (1962), and cases cited therein. The four incidents of the prosecutor in question fall within both of the above rules and, therefore, are not erroneous.

■ Defendant's fifth proposition of error alleges that a remark made by the trial court about Dr. Sam Collins, the expert psychiatric witness called by defendant, prejudiced defendant and injured the credibility of the witness with the jury. We find it unnecessary to discuss the argument put forth by defendant or by the State, as defendant failed to object to the remark at trial and has waived the right to challenge it on appeal in the absence of fundamental error. See Johnson v. State, 1 Okl.Cr. 321, 97 P. 1059 (1908) and Martin v. State, Okl.Cr., 463 P.2d 995 (1970).

■■ In his sixth assignment of error, defendant objects to the court's failure to give the jury a verdict form for "not guilty by reason of temporary insanity." Instead, the trial court gave the jury a verdict form which read simply, "not guilty." Defendant claims that such verdict form had the effect of telling the jury that it should not return a verdict of not guilty by reason of temporary insanity. We disagree for the reasons set forth in Webster v. State, 96 Okl.Cr. 44, 248 P.2d 646 (1952), and Page v. State, Okl.Cr., 332 P.2d 693 (1958). As stated in *Webster*, supra, the better practice might be to furnish separate forms for every legal conclu-

sion that can be anticipated, but it is not improper to furnish the jury with a blank verdict form to be filled out by the jury. As stated in *Page,* supra, the decision of whether or not to submit jury forms at all is within the discretion of the trial court and does not affect defendant's substantial rights. The trial court's instruction on the defense of temporary insanity was sufficient to apprise the jury of the possibility of a non-guilty verdict by reason of temporary insanity. Thus, the failure to furnish the jury with this specific verdict form was not prejudicial and we find that this proposition is without merit.

 In his seventh assignment of error, defendant states that the trial court's instruction to the jury regarding the fixing of punishment in the event of a guilty verdict, as being erroneous in the absence of a request for such an instruction by the defendant. He concedes that the rule set forth in Leasure v. State, 48 Okl.Cr. 307, 290 P. 931 (1930) and Chandler v. State, 3 Okl.Cr. 254, 105 P. 375 (1909), is that an instruction to the jury regarding punishment in absence of a request for such an instruction by defendant is erroneous, but will not lead to reversal by this Court unless the punishment assessed is excessive or unless prejudice or injury is shown. Defendant claims that the life sentence imposed in the instant case is so excessive as to fall within the above rule and thereby necessitates reversal or modification.

We disagree. The instruction given was in accord with the terms of 21 O.S.1971, § 715, which prescribes a minimum sentence of four years upon conviction for First Degree Manslaughter. It does not prescribe a maximum sentence. In disposing of this assignment of error, it is enough for us to point out that this Court has repeatedly upheld extremely lengthy sentences for crimes for which no statutory maximum is provided. See Fields v. State, Okl.Cr., 501 P.2d 1390 (1972) and Lewis v. State, Okl.Cr., 449 P.2d 930 (1969).

Defendant next contends that the court should have either excluded the testimony of Mr. William J. Cavney, State Chemist, or should have granted defendant's Motion for Continuance. The testimony objected to concerned the results of comparison tests run on paint scrapings from the rifle, hammer, and bedroom door mentioned in the statement of facts. Defendant made two requests of the prosecutor for a copy of the report. The first was at the preliminary hearing on February 22, 1972. At that time the prosecutor stated that he did not have the report, but that defendant could have it when it was returned from the State Chemist's office. The other request for the report was made at the pretrial conference, February 15, 1973. It is unclear from the record just when the prosecutor received the report, but he answered defendant's second request with the offer to provide defendant with any technical reports he had. It is clear from the record that defendant did not take any affirmative action to pursue this offer until the second day of trial—March 9, 1973. At that time defendant made the Motions which are the subject of this assignment of error.

 Both the State and the defendant acknowledge the established rule that the matter of a continuance is within the sound discretion of the trial judge, reversible by this Court only for manifest abuse of discretion. See Crumb v. State, Okl.Cr., 458 P.2d 909 (1969). There was no such abuse of discretion here for three reasons. First, defendant has failed to show that the delay in the production of the report in any way influenced the verdict of the jury. See Davis v. State, 7 Okl.Cr. 322, 123 P. 560 (1912). Second, this Court has held that a prerequisite to a right to a continuance in order to meet evidence introduced over objection at trial is the exercise of due diligence in obtaining such evidence before trial. See Reynolds v. State, 60 Okl.Cr. 92, 61 P.2d 269 (1936). We realize that it may be argued that the two requests made by defendant for the report constituted due diligence in and of themselves; however, the fact that defense

counsel failed to affirmatively pursue the offer made by the prosecutor at the pretrial conference indicates, to us, a lack of due diligence. A third basis for this decision is the rule stated in Morse v. State, 63 Okl.Cr. 445, 77 P.2d 757 (1938), that a reasonable time for trial preparation depends on the circumstances of the particular case. We are here faced with a situation wherein a defendant has not used due diligence in obtaining a technical report of minimal importance to the outcome of the trial. The "reasonable time" allowable to meet such evidence may accordingly be short, and need not include a continuance. The trial court properly exercised its discretion in admitting the testimony of Mr. Cavney and in refusing to grant a continuance.

In his ninth assignment of error, defendant cites trial court instructions 3–12, claiming the instructions as a whole denied to him the defense of temporary insanity to the charge of First Degree Manslaughter. We find this argument to be essentially the same as that presented in defendant's third assignment of error, and we reject it for the reasons cited therein. The cases cited by defendant are not in point, as they support defendant's argument only upon the assumption that the trial court did not adequately instruct on the defense of temporary insanity. Such an assumption is incorrect, as discussed earlier.

 In his final assignment of error, defendant urges that the trial court's failure to instruct on the question of circumstantial evidence constituted reversible error. We need only refer to the long-standing rule that where no requested instruction on a given point of law was submitted, this Court will examine the trial court's failure to instruct on that point of law only for fundamental error. Pierce v. State, Okl.Cr., 495 P.2d 407 (1972). Defendant admits that he did not submit such a requested instruction on circumstantial evidence, but cites Dill v. State, Okl.Cr., 437 P.2d 459 (1968) as authority which would allow the failure to so instruct to be reversible error nonetheless. *Dill,* supra,

stands for the proposition that where the circumstantial evidence against defendant is weak, an instruction on circumstantial evidence should be given even if not requested by defendant. Suffice it to say that the evidence against defendant in the instant case was overwhelming, and the *Dill* rule is not applicable.

Having dealt with all of defendant's assignments of error, and finding nothing in the record which requires modification or reversal, the judgment and sentence appealed from is accordingly affirmed.

## OPINION ON REHEARING

Larry Wayne Stuart, hereinafter referred to as defendant, has petitioned for rehearing following the decision handed down by this Court on April 29, 1974, wherein we affirmed the sentence of life imprisonment imposed on him by the District Court, Canadian County, for the offense of Manslaughter in the First Degree.

On rehearing, defendant again argues that reversible error occurred in the method used to select the jury panel from which his jurors were chosen. Briefly stated, the procedure which was used was as follows: the District Judge, Court Clerk, and Sheriff, met in the District Courtroom with the Bailiff posted outside the door under orders to prevent anyone from entering while the selection process was underway. Defendant claims that this was not in substantial compliance with the provisions of 38 O.S.1971, § 21, which require that the jury panel selection be done "in open court."

 On rehearing defendant takes specific exception to that part of our earlier opinion in which we stated that there was little chance of taint in the procedure followed by the District Court because ". . . the drawing was visible to the public through the glass windows of the courtroom door." Defendant claims that the windows in the Canadian County Courthouse doors were so small that it cannot be said that they afforded an actual view of the proceedings to the public. Assuming

arguendo that defendant is correct, we find our overall view of this assignment of error to be unchanged. We refer first to the language of 22 O.S.1971, § 634:

"A challenge to the panel must be taken before a jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the ground of challenge."

We also rely on 38 O.S.1971, § 29, which, in referring to the statutes governing the selection of grand and petit jury panels, states:

" . . . A substantial compliance with the provisions of this Chapter, shall be sufficient to prevent the setting aside of any verdict rendered by a jury chosen hereunder, unless the irregularity in drawing, and summoning or empaneling the same, resulted in depriving a party litigant of some substantial right; *provided, however, that such irregularity must be specifically presented to the court at or before the time the jury is sworn to try the cause.* [Emphasis added]

We realize fully that defense counsel did not discover the alleged irregularity until well after trial, and that this was *not* due to a lack of diligence on his part; however, the matter of due diligence relates to the question of newly discovered evidence as grounds for new trial—it does not relate to the question of whether Motions to quash the jury panel are in proper form or are timely made. Thus, the absence of a lack of diligence on the part of defense counsel did not relieve him from the obligation of complying with the above cited statutes. Because he did not present a challenge to the panel, in writing, before the jury was sworn, as required by 22 O.S. § 634, supra, and because he did not specifically present the irregularity to the court at or before the jury was sworn, as re-quired by 38 O.S. § 29, supra, we must again reject this assignment of error.

■ An additional word might be in order as to the correct procedure to be followed in jury panel selections. While the method of selection employed in the instant case has, in our view, achieved substantial compliance with the statutory requirements, we strongly suggest that a somewhat different procedure be followed in future cases. The goal would be to avoid future controversies as to whether the drawing was "in open court," as per 38 O.S. § 21, which states in pertinent part:

" . . . The officers attending such drawing shall not divulge the name of any person that may be drawn as a juror to any person . . . "

We believe that the two requirements can be reconciled by allowing the public into that part of the courtroom reserved for spectators, while excluding them from the area behind the railing reserved for counsel table, jury box, and bench, wherein the selecting officers should conduct the drawing. Dowell v. State, 96 Okl.Cr. 86, 248 P.2d 256 (1952). Allowing the public to observe the drawing from within the courtroom would completely negate any inference of impropriety. At the same time, the selecting officers, on the other side of the railing, could maintain the anonymity of the names chosen by properly folding the ballots so that no names would be visible to the spectators, and by refraining from calling the names aloud.

The other assignment of error raised by defendant on rehearing is a reiteration of proposition no. 8 in his appellate brief. We reject it now for the same reasons as stated in our original opinion.

For all of the above and foregoing reasons, the Petition for Rehearing is denied. The Clerk of this Court is directed to issue the Mandate forthwith.